564 A.2d 174

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Joanne RODRIQUEZ, Appellant.**

Superior Court of Pennsylvania.

Argued April 19, 1989.

Filed July 24, 1989.

Reargument Denied Sept. 29, 1989.

Robert B. Evanick, Public Defender, York, for appellant.

Janice M. Gottshall, Asst. Dist. Atty., York, for Com., appellee.

Before ROWLEY, POPOVICH and JOHNSON, JJ.

POPOVICH, Judge:

This case involves an appeal from the judgment of sentence (eight to twenty-three months imprisonment) for possession with intent to deliver cocaine by the appellant, Joanne Rodriquez.[1]

On appeal, the appellant's argument centers upon the lower court's denial of her motion to suppress evidence removed from her purse during a drug raid of her apartment by police.

In such a context, we are required to consider only the evidence of the appellee (herein, the Commonwealth), and so much of the evidence of the appellant (herein, the defendant) which, as read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. White*, 358 Pa. Super. 120, 516 A.2d 1211, 1212 (1986). So viewed, the record indicates that on July 14, 1987, a confidential informant advised York City Police Lieutenant G. Edward Flanagan that a "drug vending operation" was taking place at 405 South George Street, and that it was being carried on by a Puerto Rican female.

The police's efforts to make a controlled buy on July 14th proved unsuccessful. However, the following evening, at approximately 1:00–1:15 a.m., the same informant told the police: "... they were again selling drugs at that location."

The police drove the informant to 405 South George Street to make a drug purchase with $25.00 advanced by the authorities. When the informant returned from the exchange, he gave police a packet which was field-tested (using the Cobalt Thiocyanate kit) and found to be cocaine. He also proceeded to give the police a detailed physical description of the male individual who sold him the drug and that there were six to seven people in the apartment.

1. The appellant remains on bail pending the outcome of this appeal.

It was at this point that the informant stated to the police that the group at 405 South George Street was leaving "to go to a speakeasy ... to get rid of the solid drugs."

Lieutenant Flanagan gathered other officers "as quickly as possible" and told them about the drug purchase from a Puerto Rican male (by the name of "Cheeco") and that there was a Puerto Rican female living at the apartment who also might have been selling drugs.

Once at the scene, Lieutenant Flanagan and another officer stationed themselves at the back door of the apartment, while Officers Ronald Mehring and James MacBride were to approach the apartment from the front. According to Officer Mehring, as he walked toward the apartment, he saw three Hispanic females standing on the steps of the apartment entrance. No sooner had the two officers reached the steps than Officer MacBride caught a packet (containing what appeared to be a drug) thrown from the apartment window. As told by Officer Mehring:

> Then [he] asked if anyone lived there. [The appellant] indicated that she did. And [he] ushered the three Hispanic females into the house. It wasn't until after [they] had walked over where the door would shut that [he] saw a pocketbook laying [sic] on the steps there. Since [he] was ushering the three Hispanic females inside, [he] figured it belonged to one of them. [He] picked it up.
>
> Once inside the house, [he] asked whose pocketbook it was. [The appellant] indicated it was her pocketbook.
>
> He searched it for possible weapons. [His] intention was to return the pocketbook to [the appellant]. There were no weapons in it, but [he] found the drugs.
>
> Specifically, [he] found a plastic bottle which had the [appellant's] name and a pharmacy on it and contained four aluminum packets with a white substance in each packet.
>
> The content of the plastics tested positive for cocaine, and various denominations of money were also in the pocketbook.

The police gained entry into the apartment, both through the rear and front doors, by kicking the doors. This was preceded by a knock and announcement of the police's identity.

At the suppression hearing, it was the appellant's recollection that she was not asked if she lived at 405 South George Street until well after her arrest while she was at the police station. Further, she claimed that the police forced her into the apartment at gun point, a matter about which both Officers Mehring and MacBride stated they could not recall if such were the case. However, at trial, Officer Mehring testified he picked up the appellant's purse with his right hand and in his left hand he had a flashlight. As he stated: "So on that basis alone, I would state that my gun was not drawn." [2]

Following the denial of the appellant's motion to suppress, a non-jury trial took place wherein the preceding information was presented. Additionally, the Commonwealth's expert (York City Police Officer John Daryman) testified that, in his opinion, the nine individually wrapped glassine packets of cocaine seized from the appellant's purse were consistent with the selling of drugs and not merely possession for one's use. This was buttressed by the seizure of a letter from the appellant's purse containing names on the back, which were recognizable to the witness as individuals involved with drugs from the South George Street area and whose names were kept, in his opinion, by one to whom money was owed for the sale of drugs.

A verdict was returned finding the appellant guilty as charged. A sentence was imposed, post-trial motions were denied and an appeal to this Court was perfected.

2. We note that the trial court, in its opinion to us, recounts the facts with the officers having their guns drawn when directing the appellant into the apartment from the porch steps. Since it is for the finder of fact to make credibility determinations, and because the evidence (albeit garnered from the appellant's testimony) is supportive of such a finding, we cannot fault the court below or hold that it is not supported by record evidence. See *Commonwealth v. Carelli,* 377 Pa.Super. 117, 129 n. 1, 546 A.2d 1185, 1191 n. 1 (1988).

The issues raised by the appellant, when synthesized, challenge her "seizure" and the subsequent "search" of her purse incident to a warrantless search of her apartment.

As a starting point, we note that the warrant requirement is an important check upon the power of the State to subject individuals to unreasonable searches and seizures and is not to be highly disregarded. *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). The exceptions to the Fourth Amendment requirement have been oft-stated and consist of a consensual search, a search incident to an arrest and exigent circumstances. *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

In *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Supreme Court discussed the Fourth Amendment and exceptions to its warrant requirements:

These [exceptions to the warrant requirement] have been established where it was concluded that the public interest required some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search. Thus a few "jealously and carefully drawn" exceptions provide for those cases where the societal costs of obtaining a warrant, such as a danger to law officers or the risk of loss or destruction of evidence, out-weigh the reasons for prior recourse to a neutral magistrate.... But because each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and "the burden is on those seeking the exemption to show the need for it." Moreover, we have limited the reach of each exception to that which is necessary to accommodate the identified needs of society.

442 U.S. at 759, 760, 99 S.Ct. at 2590, 2591 (Citations omitted).

■ In the instant case, the police had their informant make a controlled buy of cocaine from the South George Street address. At the completion of the transaction, the

police were advised by the informant that the group at the stated address was leaving the premises for another location with the intention of getting "rid of the solid drugs".

The police, with no time to secure a warrant, gathered the necessary uniformed officers to make a warrantless entry of the premises, the obvious objective being to secure evidence before it was removed and lost to them. Thus, given the immediacy of the situation, the police were justified in effectuating entry without a warrant.

The legality of the actions of Officer Mehring subsequent thereto in "seizing" the person of Rodriquez and the search of her purse are one of first impression in this Commonwealth in that they were accomplished without the use of a warrant and during the course of a drug raid on property from which a Puerto Rican male was the known distributor of the cocaine sought.

We look for guidance from the United States Supreme Court's ruling in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), where in the police had obtained a warrant to search a home for narcotics. Once at the location, the police saw the defendant exit the front door of the home and proceed across the porch and down the steps. They requested his assistance in gaining entry [3] and detained him while they searched the premises. After finding narcotics in the basement and ascertaining that the defendant was the owner of the home, he was arrested. A search of his person by police produced an envelope containing 8.5 grams of heroin.

The suppression court's grant of the defendant's motion, and its affirmance by the appellate courts of Michigan, was reversed by the United States Supreme Court.

The *Summers* Court, albeit assuming that the pre-arrest "seizure" of the defendant was unsupported by probable cause, acknowledged a body of law which "demonstrate[d]

**3.** The police obtained entrance to the premises by forcing open the front door. Once admittance had been gained, one officer instructed another officer to bring the defendant, who was still on the porch, into the house.

that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry [v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ] and *Adams [v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ]." *Id.*, 452 U.S. at 700, 101 S.Ct. at 2593; *United States v. Whitehead*, 849 F.2d 849, 856 (4th Cir.1988); *United States v. Quinn*, 815 F.2d 153, 156 (1st Cir.1987).

The Court held that, for Fourth Amendment purposes, a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the *occupant* of the premises while a proper search is conducted.

In assessing the justification for the detention of an occupant of premises being search for contraband pursuant to a valid warrant, the *Summers* Court felt that both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. As it stated the matter:

> Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. * * * [T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.[17] The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.
>
> [17] The fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant. No such question, however, is presented by this case.

452 U.S. at 702–703 & n. 17, 101 S.Ct. at 2594 & n. 17 (Citations omitted).

The question left open by the *Summers* Court in footnote 17, *i.e.*, detention of an occupant (interpreted by

some courts to mean an owner rather than merely a visitor[4]) of a home during a warrantless search for drugs, is presently before this Court. Before deciding the matter, we find it appropriate to examine the conduct of the police prior to entering the South George Street apartment.

To the appellant's complaint that the officers' directing her into the apartment at gun point and advising her of *Miranda*[5] rights constituted a formal arrest, which, because there was a lack of probable cause to believe that she was engaged in criminal activity, tainted the drugs found in her purse, we find the claim to be unsupported by the law when applied to the facts.

To begin with, because of the exigencies of the situation (*i.e.*, the removal of drugs from the apartment and the presence of numerous people in and about the apartment at 1:00 a.m.), a potentially volatile situation confronted the officers. See *Summers*, supra; *Williams v. Com.*, 4 Va. App. 53, 354 S.E.2d 79, 87 (1987); *Allen v. Com.*, 3 Va.App. 657, 353 S.E.2d 162, 165 (1987). As such, Officer Mehring's escorting of the appellant into the apartment at gun point (so found the suppression court), once she admitted that she lived there, was sound police practice in maintaining order during the initial moments of the search to avoid surprises and minimizing the risk of injury to those present. Additionally, the appellant's presence might have proved useful in facilitating the search. See *Summers*, supra; *United States v. Rowe*, 694 F.Supp. 1420, 1424 (N.D.Cal.1988).

We refuse to interpret the police's use of a weapon, in directing the appellant into the apartment, and the rendition of *Miranda* rights to be the equal of a formal arrest. Rather, given the circumstances confronting the officers, we find the situation to rise no higher than a justifiable "detention" of the appellant during the search of *her* apart-

**4.** See *Martin v. State*, 761 S.W.2d 26, 29 (Tex.App.1988) ("It is ... clear that the word 'occupant' as used by the Supreme Court in *Summers* does not include a mere visitor." (Citation omitted)).

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ment. See *Summers,* supra; see also *United States v. Winsor,* 816 F.2d 1394, 1400 (9th Cir.1987) (Forceful entry with guns drawn not equal to arrest where circumstances existed justifying the police's fear for safety); *United States v. Quinn,* supra (While handcuffing is relevant to issue of custody, it would not necessarily elevate an investigative stop into a *de facto* arrest); *People v. Zuccarini,* 172 Mich.App. 11, 431 N.W.2d 446, 448 (1988) (Handcuffing of defendant did not constitute arrest; it was reasonable, limited intrusion of his liberty under the circumstances then present); *State v. Banks,* 720 P.2d 1380, 1382–1383 (Utah 1986) (Although defendant was handcuffed, frisked and read his *Miranda* rights, this was not an arrest but done to insure the officers' safety); Dissenting Opinion by Popovich, J. in *Commonwealth v. Hook,* 313 Pa.Super. 1, 459 A.2d 379 (1983) (Directing defendant outside of 7–Eleven convenience establishment was not an arrest, but done for the safety of the two individuals in the store).

We find that the safety of the officers was served by the governmental intrusion of the appellant's person and purse, Officer Mehring admitting as much when he recounted that it was common practice in the department to open purses during drug raids for the safety of the police. Also, the intrusion is held to have been minimal. See *New York v. Class,* 475 U.S. 106, 118, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986). The justification for such conduct has its roots in the seriousness with which drug curtailment has been approached by our society. The needless loss of life attendant to the illegal drug industry is all too well documented in the newspapers as a virus which reeks havoc on users, distributors and law enforcers. As noted by one court on this ever increasing scourge that plagues our society:

Although the suspicion of narcotics possession and distribution is not universally recognized as a circumstance which, standing alone, gives rise to an inference of dangerousness, we believe that the better view is that it does. *See [United States v. ] Post,* 607 F.2d [847] at 851

[9th Cir.1979]. The Supreme Court implied as much in *Summers* when it stated: "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." 452 U.S. at 702, 101 S.Ct. at 2594.

We hold, therefore, even though the officers who detained [the defendant] had no information that he was armed or that he had a past history of violence, they acted reasonably when conducting a protective patdown search for weapons in light of the fact that they had a reasonable suspicion that Williams was presently engaged in narcotics distribution. To hold otherwise would be an invitation to violence in what is always a potentially explosive situation.

*Williams v. Com.*, supra, 354 S.E.2d at 87 (Citations omitted).

Likewise, in the case at bar, the police were participating in a drug investigation (covering two days and emanating from the same address) reportedly involving a Puerto Rican male and female, who were in the company of several individuals at the apartment, and action had to be taken soon to preclude the intended disposal of the drugs by the South George Street "group" at a "speakeasy". Drugs had been sold to the informant from the stated apartment the day before the raid by a Puerto Rican female, while the sale on the day of the raid was made by a Puerto Rican male. Thus, because of the information regarding the removal of the drugs from the premises, from which drugs were purchased by an informant a short time before, the police were confronted with a quickly developing situation requiring prompt action.

With the police's arrival at the apartment, and the appellant admitting her residence as the apartment in question, the police's forcible entry was a proper response to the situation. See *Summers*, supra; *Williams*, supra. No less appropriate was Officer Mehring's search of the appellant's

purse. As noted by Chief Justice Burger in his dissenting opinion in *Ybarra v. Illinois,* 444 U.S. 85, 97, 100 S.Ct. 338, 345, 62 L.Ed.2d 238 (1979) (it was joined by Justices Blackmun and Rehnquist), which dealt with a frisk of a patron present in a tavern for which the police had a warrant to search:

> Were they [the police] to ignore these individuals [9–13 patrons in the tavern] and assume that all were unarmed and uninvolved? Given the setting and the reputation of those who trade in narcotics it does not go too far to suggest that they might pay for such an easy assumption with their lives. The law does not require that those executing a search warrant must be so foolhardy.

The suppression court here was of the same mind when it wrote on this that the police did not want to return the appellant's purse to her without checking its contents first for a weapon.

Given the facts presently before us, we have no hesitancy in concluding that the police acted properly (where the appellant admitted being an "occupant" of an abode about to be raided for drugs recently sold). Compare *Ybarra v. Illinois,* supra; *United States v. Robertson,* 833 F.2d 777 (9th Cir.1987); *Bragg v. State,* 536 So.2d 965 (Ala.Cr.App. 1988); *Julian v. State,* 528 So.2d 427 (Fla.App.1988); *Martin v. State,* 761 S.W.2d 26 (Tex.App.1988).

We tread on virgin ground in our holding this day,[6] but we act confidently, knowing that the principles enunciated by the United States Supreme Court in *Summers* and its progeny, *i.e.,* warrant situations, are just as applicable to the case *sub judice* so as to justify the warrantless detention of the appellant and the subsequent search of her purse for safety purposes before returning it to her.

Judgment of sentence affirmed.

**6.** Compare *Commonwealth v. Carr,* 334 Pa.Super. 459, 483 A.2d 542 (1984) and *Commonwealth v. Reicherter,* 317 Pa.Super. 256, 463 A.2d 1183 (1983).