614 A.2d 1378

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Joanne RODRIQUEZ, Appellant.**

Supreme Court of Pennsylvania.

Argued May 8, 1992.

Decided Sept. 18, 1992.

Robert Bruce Evanick, Public Defender, for appellant.

Christy H. Fawcett, Asst. Dist. Atty., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, MC DERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This case comes before us on the question of whether police officers may detain a person in the vicinity of a drug raid absent probable cause or reasonable suspicion linking that individual to the criminal activity under investigation. For the reasons that follow we find detention of individuals under circumstances lacking probable cause to be unconstitutional.

### History of the Case

The present appeal arises out of a confidential informant's tip to Lieutenant Flanagan of the York City Police Depart-

ment, that a "drug vending operation" was being conducted in an apartment at 405 South George Street, York, Pennsylvania. The informant stated that there were several individuals involved in the operation, including a Puerto Rican female. The informant offered no further description of the woman.

Upon receiving this information, Lt. Flanagan attempted to make a controlled buy using the informant; however, this initial attempt was unsuccessful. The following evening a controlled buy was made. After purchasing the drugs, the informant told Lt. Flanagan that there were six or seven people in the apartment planning to leave immediately with the drugs to transact sales at a local speakeasy. The informant further described the person from whom he had purchased the drugs as a Puerto Rican male in his mid 20's, 5'7" tall, 130 pounds, with a pig-tail down his back, whose name was "Cheeco." The informant offered no information at that time regarding the Puerto Rican female to whom he had referred earlier.

Acting on the tip that the occupants and drugs would quickly be vacating the apartment, Lt. Flanagan decided to conduct a search of the premises immediately, rather than first obtaining a search warrant. To that end, three officers approached from the rear of the apartment building, while two other officers entered the front of the building. As the two officers, MacBride and Mehring, approached the front of the building with guns drawn, a packet of drugs was thrown out of the window of the apartment in question and caught by Officer MacBride.

At the same time, Officer Mehring observed, what he described as three Puerto Rican females, sitting on the stoop in front of the entrance to the multi-family apartment building. Addressing the three women, he asked "Do you live here?" The appellant, Joanne Rodriquez, responded affirmatively. Officer Mehring then ordered all three women, at gunpoint, into the particular apartment that was being searched. As he followed them inside, he observed a purse lying on the stoop.

He picked up the bag and carried it inside the apartment. All three women were detained for the duration of the search, along with the occupants of the apartment. *Miranda* [1] warnings were given "en masse" to all of the individuals detained during the search.

Officer Mehring then inquired of the three women whether one of them owned the purse he had found. Appellant again responded affirmatively. Before returning the purse to appellant, Officer Mehring opened it, purportedly to search for weapons. Upon opening the purse, he observed several baggies and a prescription bottle, each containing illegal narcotics. Appellant was placed under arrest and charged with possession of narcotics with intent to deliver. [2] After determining that no outstanding warrants existed for the other two women, Officer Mehring allowed them to leave the apartment.

Prior to trial, appellant moved to suppress introduction of the narcotics into evidence, asserting that they had been seized as a result of her illegal arrest at the scene of the drug raid. The trial court denied the motion to suppress, and, following a non-jury trial, appellant was convicted of possession with intent to deliver. On appeal to the Superior Court, judgment of sentence was affirmed, 387 Pa.Super. 271, 564 A.2d 174; a subsequent petition for reargument before the court en banc was denied. The petition for allowance of appeal to this Court was granted.

## Discussion

■ The parties do not dispute that appellant was "seized" by Officer Mehring when she was taken at gunpoint from the stoop in front of the apartment building and detained by the officers inside the apartment for the duration of their search. Thus, we are not faced with determining whether a seizure occurred, but rather whether the seizure that did occur was justified under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
2. 35 P.S. § 780–113.

The trial court treated the detention of appellant as a "freeze," a police action falling somewhere below an arrest based upon probable cause and a "stop and frisk" justified on a showing of reasonable suspicion under the narrow exception to the constitutional probable cause requirement created by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The trial court, further, justified the "freeze" in the instant case by relying upon *Commonwealth v. Carr*, 334 Pa.Super. 459, 483 A.2d 542 (1984). In *Carr*, employees of a service station were detained at the station while police executed a warrant for controlled substances believed to be hidden therein. The Superior Court concluded that detention of the employees was constitutional during the execution of a search warrant. The *Carr* holding was based entirely upon the United States Supreme Court's decision in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

In the instant case, the Superior Court agreed with the trial court that, although there was no search warrant as in *Carr*, the detention of appellant was nonetheless justified as a reasonable police action under the circumstances. The Superior Court grounded its decision upon an extrapolation of the United States Supreme Court opinion in *Summers*. Although acknowledging that its decision constituted a considerable leap from the actual holding in *Summers*, the Superior Court argued that the exigencies of the circumstances in the case *sub judice* justified the police action in detaining appellant.

However, even assuming, *arguendo*, that the Supreme Court's decision in *Summers* accurately reflects Pennsylvania constitutional law, *Summers* is wholly inapplicable to this case. The police in *Summers, armed with a valid warrant*, stopped the defendant as they were approaching the house in which he resided. At the time, the defendant was walking down the front steps away from the premises. The officers had observed the defendant exit the house, identified themselves, and explained their purpose. The officers requested the defendant's assistance in gaining admission to the house. The

defendant stated that he had left his keys inside, and admission was requested from another resident, who refused to open the door. Ultimately, the door was forced open and the defendant was detained inside the home along with the other residents while the search was conducted.

In *Summers*, the United States Supreme Court held "that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. at 2595 (footnotes omitted). In reaching this conclusion, the Court placed significant emphasis upon the existence of a warrant: "[o]f prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband." *Id.* at 701, 101 S.Ct. at 2593.

The initial critical distinction between the instant case and *Summers*, is that here the police were not in possession of a valid warrant issued by a neutral and detached magistrate upon a finding of probable cause.[3] The second, and even more compelling distinction, is the absence in the instant case of a link between the appellant and the apartment from where the drugs were allegedly being distributed.

The importance of establishing a connection between suspected criminal activity in a targeted premises and the persons who reside in those premises was critical to the analysis of the Court in *Summers:*

> It is also appropriate to consider the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant. We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a

---

3. The issue of the constitutionality of the search of the apartment is not presently before us.

crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. *The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.*

*Id.* at 703–04, 101 S.Ct. at 2594–95 (footnote omitted; emphasis added).

The *Summers* opinion was carefully and deliberately confined to the specific facts then before the court.[4] As the *Summers* Court repeatedly pointed out, what distinguished the police action in *Summers* from the illegal detention earlier condemned by the Court in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979),[5] was that a warrant had been issued by a neutral and detached magistrate after a finding of probable cause and that it is reasonable to suspect that a resident of a place housing illegal activity would be linked to the criminal conduct in question. 452 U.S. at 705 n. 19, 101 S.Ct. at 2595 n. 19.

Turning to the facts in the instant case, regardless of whether the police search of the apartment was constitutional, it was not based upon a determination by a neutral and detached magistrate that probable cause existed. More importantly, there was no probable cause to believe or reasonable basis to suspect that appellant was connected in any manner with the supposed criminal activity within the apart-

---

4.  452 U.S. at 702 n. 17, 705 n. 20 and 21, 101 S.Ct. at 2594 n. 17, 2595 n. 20 and 21.

5.  In *Dunaway* the Court suppressed the defendant's confession which had been obtained when he was taken into police custody and interrogated without a warrant or probable cause. The United States Supreme Court firmly rejected the position that a balancing test should be created under which police conduct which is less than an arrest but more than a "stop and frisk" was permissible under the Fourth Amendment. In refusing to adopt "a multifactor balancing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests," the Court stated, "the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." 442 U.S. at 213–14, 99 S.Ct. at 2257–58.

ment. Officer Mehring's question, "Do you live here?," lacks sufficient specificity and could easily have been interpreted by the appellant as a reference to the entire multi-family apartment building. Further, the bald and unsubstantiated allegation by the informant that the night before he had seen a Puerto Rican woman in the apartment, accompanied by no additional information or, description of that person, cannot and does not establish reasonable suspicion to detain three women who may appear to be Hispanic.[6]  One wonders whether Officer Mehring would have detained all Caucasian females found outside the building had the informant reported the presence of a Caucasian female in the apartment on a prior visit.

Thus, we emphatically reject the conclusion of the Superior Court that the police action in this case was a legitimate exercise of governmental authority based on a reasonable extension of the holding in *Michigan v. Summers*. We find that *Summers* was intended to be limited to the specific facts presented in that case and that the facts in the case *sub judice* go well beyond the federal constitutional authority of police officers to detain a known occupant of a search premises when executing a valid search warrant.

However, our analysis of the instant case does not end at this point. We have addressed the applicability of *Summers* arguendo simply because it was the basis of the lower court's decisions. Even if *Summers* had been controlling, it would not have ended our inquiry. Appellant argues that her detention was not only violative of the Fourth Amendment to the United States Constitution, but also violated her rights under Article I, Section 8 of the Pennsylvania Constitution. As we recently stated in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991):

> [I]t is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where

6.  Only the detention of appellant is presently before the Court. However, we find it relevant to the overall actions of the police in this case that all three women were detained.

they 'are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees,' ... we are free to reject the conclusions of the Untied States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

*Id.* at 389–90, 586 A.2d at 894–95 (citations omitted).

■ As previously stated, all parties to the present action concede that the appellant was seized. It is the legitimacy of that seizure which we must analyze under Pennsylvania constitutional law.[7] In accordance with the protections afforded our citizens under Article I, Section 8, we have recognized only two instances where police may "seize" an individual, both require an appropriate showing of antecedent justification: first, an arrest based upon probable cause, *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987); second, a 'stop and frisk' based upon reasonable suspicion, *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969). The Commonwealth argues that we should expand these two limited and well-established categories and create a new category of what the Superior Court in this case called "justifiable detention," deemed to be reasonable based upon a subjective balancing of all the circumstances confronting the officer. *Commonwealth v. Rodriquez*, 387 Pa.Super. 271, 564 A.2d 174 (1989). We decline the Commonwealth's invitation now, just as we did a decade ago in *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982).

7. The dissent asserts that we have failed in our obligation under *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), to properly analyze the impact of the recent United States Supreme Court decision in *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), upon the law of this Commonwealth regarding arrest. It is respectfully submitted that *Hodari D.*, which deals with the question of at what point in a police chase of a suspect a seizure of the person occurs, is not relevant to the instant case. All parties to the present action have conceded that the appellant was in fact "seized" by the police when she was ordered into the apartment in question at gunpoint. The issues in the instant case are the justification for the seizure of appellant, and the further justification for searching the appellant's purse. Neither of the two concerns raised by the instant appeal are related to the issues addressed in *Hodari D.*

In *Lovette,* the defendant was seized a short distance away from the scene of a burglary and transported back to the scene by a police officer. The original stop of the defendant (and his two companions) was based solely upon the fact that they were in the vicinity of the burglary and had mud on their shoes.[8] In reversing the denial of his motion to suppress, this Court found that the defendant had been placed under arrest without probable cause when he was seized by the officer, placed in the patrol car, and transported to the scene of the burglary. This Court also rejected the argument that the police action was simply a "stop and frisk" justifiable under *Terry v. Ohio,* as the circumstances described by the officer utterly failed to establish "an articulable basis for suspecting criminal activity." 498 Pa. at 673, 450 A.2d at 979.

The Commonwealth then suggested that the seizure in *Lovette* was necessary for "investigative purposes" hence a broader application of the *Terry* exception to probable cause requirements should apply. This Court emphatically rejected the Commonwealth's invitation to create additional exceptions to the constitutional requirement of probable cause beyond *Terry.*

> The instant factual situation is also illustrative of the uncertainties attendant to any attempt to expand the *Terry* exception and reinforces the wisdom of scrupulously adhering to the narrow scope of the exception.

> Consequently, we must conclude that the constitutional validity of the seizure of the person of appellant in this case is at best dubious. Since the seizure unquestionably constituted an arrest as defined in this jurisdiction which requires probable cause, we are not persuaded that we should, on this record, depart from that longstanding respected precedent.

498 Pa. at 676–77, 450 A.2d at 980–81 (citation omitted).

In the case *sub judice* the Commonwealth again argues for erosion of the boundaries of the *Terry* exception to probable

8. Muddy footprints had been found within the burglarized home. However, the vicinity within which the defendant and his companions were seized contained many dirt yards and vacant lots of dirt and concrete. 498 Pa. at 668 n. 2, 450 A.2d at 976 n. 2.

cause, this time asserting the need for greater police powers to combat the "war on drugs." The Superior Court was obviously enamored with this rationale, as it stated:

The justification for such conduct [the detention of appellant] has its roots in the seriousness with which drug curtailment has been approached by our society. The needless loss of life attendant to the illegal drug industry is all too well documented in the newspapers as a virus which reeks havoc on users, distributors and law enforcers....

this ever increasing scourge that plagues our society....

*Rodriquez*, 387 Pa.Super. at 280, 564 A.2d at 179.

■ We emphatically reject the Superior Court's "ends justify the means" analysis. By focusing its attention only upon the serious ills inflicted upon society by illegal narcotics, the Superior Court failed to recognize and respond to necessary constitutional constraints on excessive police conduct. The seriousness of the criminal activity under investigation, whether it is the sale of drugs or the commission of a violent crime, can never be used as justification for ignoring or abandoning the constitutional right of every individual in this Commonwealth to be free from intrusions upon his or her personal liberty absent probable cause.

Accordingly, we decline to adopt the rationale of the Superior Court or the arguments offered by the Commonwealth, and thus, we decline to expand the appropriately narrow "reasonable suspicion" exception to probable cause already established by the United States Supreme Court in *Terry v. Ohio* and by this Court in *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969).

■ Turning then, to the requirements necessary to justify a *Terry* "stop and frisk" we again review the circumstances surrounding the seizure of appellant. In *Commonwealth v. Hicks*, those requirements were set forth as follows:

[E]ven if probable cause to arrest is absent, the police officer may still legitimately seize a person, ... and conduct a limited search of the individual's outer clothing in an attempt to discover the presence of weapons which might be

used to endanger the safety of the police officer and others, if the police officer observes unusual and suspicious conduct on the part of the individual seized which leads him reasonably to conclude that criminal activity may be afoot and that the person with whom he is dealing may be armed and dangerous.

*Id.* at 158–59, 253 A.2d at 279 (footnote omitted). Obviously, the fact that three Hispanic women were sitting upon the front stoop of an apartment building in an ethnic neighborhood does not constitute "unusual and suspicious conduct." Nor could appellant's mere presence on the stoop outside of a multi-family apartment building wherein one apartment was to be searched, lead a reasonable police officer to conclude that she was "armed and dangerous." Thus, the seizure of appellant was not justified under the rationale of *Hicks*.

     Clearly, the seizure of appellant under the facts before this Court constituted an arrest. In *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987), this Court reiterated the test for determining whether an arrest has occurred:

We have defined an arrest as any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest.... The test is an objective one, i.e., viewed in the light of the reasonable impression conveyed to the person subjected to the seizure rather than the strictly subjective view of the officers or the persons being seized.

*Id.* at 400, 525 A.2d at 1179 (citations omitted).

Having been escorted to an enclosed location at gunpoint, the only logical conclusion is that appellant was under the control and within the custody of Officer Mehring. As no reasonable suspicion existed to justify even the minimal intrusion of a *Terry* stop based merely upon the presence of appellant near the scene of the instant drug raid, obviously, no probable cause existed to justify her arrest. The seizure of appellant in the instant case and the seizure and subsequent search of her purse thus violated her rights under Article I,

Section 8 of the Pennsylvania Constitution.[9]

Accordingly, the order of the Superior Court, affirming the order of the trial court denying appellant's motion to suppress, is reversed. The matter is remanded to the trial court for a new trial. Jurisdiction is relinquished.

LARSEN, J., did not participate in the consideration or decision of this case.

McDERMOTT, J., did not participate in the decision of this case.

PAPADAKOS, J., files a dissenting opinion.

PAPADAKOS, Justice, dissenting.

I dissent for two reasons. First, the officers had reasonable suspicion to detain Appellant and, therefore, to search her purse. Second, I am not convinced that the majority has satisfied *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), in accounting for new federal case law on arrests.

As to the first reason, the informant told the police that a Puerto Rican female was involved in the illegal enterprise. Appellant, a Puerto Rican female, was discovered in the dwelling (presuming the outside stoop qualifies at least as curtilage). The police asked her if she lived there and she answered affirmatively. The police knew that drugs had been thrown from a window of the house.

The majority urges us to view police conduct as a dragnet search and seizure, which it definitely is not. Given the totality of circumstances, I believe firmly that the police surely had reasonable suspicion to detain the Appellant. Appellant satisfied the time and place requirements of the crime; addi-

9. Although we have discussed the lower courts' application of *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), to the instant case, and concluded that *Summers* is distinguishable, our holding is based only upon principles of Pennsylvania jurisprudence as developed in accordance with our state Constitution. *See Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

tionally, she matched the physical description of a Puerto Rican female given by the informant.[1]

While *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), did not specify the quantum of evidence required for the reasonable suspicion standard, it is obvious that means less than "absolutely certain." Subsequent interpretations have held the standard to be "obviously less demanding than for probable cause," *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); considerably less proof of wrongdoing that is based on "some minimal level of objective justification," *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), *rehearing denied*, 455 U.S. 1008, 102 S.Ct. 1648, 71 L.Ed.2d 877 (1982). *Terry* demands that the officer must be able to point to "specific and articulable facts" to justify the intrusion. Given what the police knew about the time, place and characteristics of the actors, the detention of Appellant was justified.

I am prepared to concede that the analysis becomes more complex because the case involves a multi-family dwelling and the police at the outset could not connect the Appellant with the specific apartment where criminal conduct took place. The majority opinion, however, advances no analysis of this problem but merely asserts in a conclusory fashion that the facts are self-executing in favor of the Appellant. That will not do at all.

The police, in effect, were chasing down subjects whom they reasonably believed may have been involved. This is no different from a police chase of targeted suspects who are fleeing any crime. As long as the *quantum* of evidence meets *Terry*, the subsequent search is acceptable. The presence of guns, moreover, was necessitated by the circumstances: are

1. The majority's strictures regarding identification of suspects by race are well taken in general, but only up to a point. First, there is no evidence of racial motivation by the police, and faint implications of such in our opinions should be avoided except on proof. Second, identification by race can be identification merely for purposes of investigation: "the assailant was a white male," or "the robber was a black female," or "a Puerto Rican female is part of the gang"—all of which designations aid the police in finding the criminal, and nothing more.

we saying that in this time in history the police cannot carry out drug busts with weapons brandished for fear of having evidence suppressed because of lack of probable cause for arrest when suspects at the scene are being investigated?

Nor will it do any longer to continue to ignore *Edmunds.* Here the majority cites *Edmunds* merely to restate the obvious point that a state can give a defendant more protection than afforded by federal cases. *Edmunds,* however, mandates much more, as I am growing weary of reminding this Court.

As such, we find it important to set forth certain factors to be briefed and analyzed by litigants in each case hereafter implicating a provision of the Pennsylvania constitution. The decision of the United States Supreme Court in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), now requires us to make a "plain statement" of the adequate and independent state grounds upon which we rely, in order to avoid any doubt that we have rested our decision squarely upon Pennsylvania jurisprudence. Accordingly, as a general rule it is important that litigants brief and analyze at least the following four factors:

1) text of the Pennsylvania constitutional provision;

2) history of the provision, including Pennsylvania case-law;

3) related case-law from other states;

4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

Depending upon the particular issue presented, an examination of related federal precedent may be useful as part of the state constitutional analysis, not as binding authority, but as one form of guidance.

526 Pa. at 390, 391, 586 A.2d at 895.

As applied to the present case, *Edmunds* requires us to *consider* other state and federal cases regarding the meaning of arrest under Article I, section 8 of our Constitution. The inquiry is necessary because the majority concluded that "clearly, the seizure of appellant under the facts before this Court constituted an arrest." (Opinion, p. 74).

78

The traditional meaning of an arrest as cited correctly by the majority is *Commonwealth v. Duncan,* 514 Pa. 395, 525 A.2d 1177 (1987), but which has been challenged dramatically by *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). *Hodari D.* rejected the view that an arrest occurs when the defendant has a reasonable belief that she was not free to leave. *Hodari D.* also addresses the issue of whether police can seize material dropped during a confrontation. In addition to binding federal courts, I point out to the majority that *Hodari D.* has been accepted by our own Superior Court. *Commonwealth v. Daniel Harper,* 416 Pa.Super. 608, 611 A.2d 1211 (1992), and *Commonwealth v. Gregory Peterfield,* 415 Pa.Super. 330, 609 A.2d 540 (1992).

Over 100 state courts so far have construed *Hodari D.* Thirty of these are courts of final review. An abbreviated listing of reported cases will suffice to illustrate the point. *Connecticut v. Cofield,* 220 Conn. 38, 595 A.2d 1349 (1991); *Robertson v. Delaware,* 596 A.2d 1345 (Del.Supr.1991); *Florida v. Greg Anderson,* 591 So.2d 611 (Fla.1992); *Idaho v. Rawlings,* 121 Idaho 930, 829 P.2d 520 (1992); *Commonwealth v. Laureano,* 411 Mass. 708, 584 N.E.2d 1132 (1992); *Michigan v. Hawkins,* 437 Mich. 1034, 471 N.W.2d 556 (1991); *Oregon v. Gerrish,* 311 Or. 506, 815 P.2d 1244 (1991).

The majority's failure to examine contemporary developments in the laws of arrest run counter to the demands of *Edmunds.* Regardless of the eventual outcome of such an analysis on the instant case, the present gaping omission must lead to dissent from the majority for failure to sustain its legal conclusions which, in turn, result from discarding recent precedent which dictates the form of analysis to be followed in cases based on Article I, section 8.