J-S13007-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| GLADYS V. RAMAEKERS, | |
| Appellee | No. 251 WDA 2014 |

Appeal from the Order Entered January 17, 2014
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP-26-CR-0002504-2013

BEFORE:  BENDER, P.J.E., MUNDY, J., and STABILE, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED APRIL 13, 2015**

The Commonwealth appeals from the suppression court's January 17, 2014 order granting Appellee's, Gladys V. Ramaekers, pretrial motion to suppress evidence.[1]  After careful review, we affirm.

The suppression court set forth the facts of this case, as follows:

> On June 20, 2013, between 7:45 and 7:50 p.m., there were three vehicles stopped at a red traffic light in the main westbound lane of West 8th Street, at the intersection of West 8th Street and Pittsburgh Avenue, in the City of Erie, Pennsylvania. The first vehicle at the light was operated by an unidentified driver.  The second vehicle was operated by … [] Appellee ….  The third vehicle in line was operated by Dedra Lynn Cavanagh ("Cavanagh").  Next to the main west bound lane was a turning

_____

[1] The Commonwealth has certified in its notice of appeal that this order terminates, or substantially handicaps, the prosecution of Appellee's case, thus permitting the Commonwealth's appeal under Pa.R.A.P. 311(d).

lane for westbound traffic intending to turn left onto Pittsburgh Avenue.

While the light was still red, [Appellee] suddenly backed up into the left turning lane, pulling up close to and stopping alongside the driver's side of the vehicle operated by Cavanagh. The unidentified driver exited the first vehicle, pointed to [Appellee's] vehicle and yelled, "She's drunk." The unidentified driver returned to her vehicle. After approximately ten seconds, the light turned green, and the driver of the first vehicle pulled over into a parking lot area. [Appellee] pulled back into the main westbound lane of West 8th Street in front of Cavanagh's stationary vehicle, and proceeded through the intersection. After waiting for [Appellee's] vehicle to proceed ahead of hers, Cavanagh followed [Appellee's] vehicle. Upon passing through the intersection, the vehicles entered Millcreek Township.

Cavanagh called 911 to report what had occurred. She reported to 911 what the driver of the first vehicle said, and that [Appellee] nearly sideswiped her [vehicle]. Cavanagh remained on the phone with the 911 Operator, who transferred the call to Millcreek [Police] Dispatch, while Cavanagh continued to follow [Appellee's] vehicle west along West 8th Street.

Cavanagh followed [Appellee's] vehicle for several miles to Valerio's Restaurant, located at the intersection of West Lake and Powell Roads in Millcreek Township. Cavanagh followed [Appellee's] vehicle into the parking lot at Valerio's. She observed [Appellee] park her vehicle and enter the restaurant. Three marked Millcreek Township Police cruisers pulled into the parking lot of Valerio's. Cavanagh spoke with one of the officers, who asked Cavanagh where … [Appellee's] vehicle was and where … [Appellee] was. After Cavanagh identified [Appellee's] vehicle and reported … [Appellee] had entered the restaurant, the officer told Cavanagh she could leave.

Cavanagh did not make any observation about the manner in which [Appellee] had operated her vehicle until [Appellee] backed up in the turning lane next to Cavanagh's vehicle on West 8th Street. Cavanagh had no way of knowing if … [Appellee] was drunk. Cavanagh did not know the driver of the first vehicle. Cavanagh did not know if the first driver had any reason to know whether or not [Appellee] was drunk. Cavanagh did not observe … [Appellee] commit any traffic violations while she followed [Appellee] several miles to Valerio's Restaurant.

- 2 -

Millcreek Township Police Officer Kevin Guica ("[Officer] Guica") testified [that] a call came in through Dispatch to all the police cars working that day at approximately 7:54 p.m. that a possibl[y] intoxicated driver was [traveling] westbound on West 8th Street. [Officer] Guica acknowledged it was the first driver, as conveyed through Cavanagh, who made the claim … [that Appellee] was under the influence. The information from Dispatch led [Officer] Guica to Valerio's Restaurant.

When [Officer] Guica arrived at the parking lot of Valerio's in a marked uniform and a marked police cruiser, there were already two other Millcreek Township police cruisers at the scene. One of the police officers was speaking with Cavanagh. The officers determined [Appellee] was the registered owner of the vehicle and obtained her description. The officer reported to [Officer] Guica … [that Appellee] had been driving alone and entered the restaurant alone.

[Officer] Guica entered Valerio's and approached [Appellee]. There were other patrons in the restaurant. [Officer] Guica asked [Appellee] if the vehicle outside was hers and if her name was Gladys Ramaekers. After [Appellee] responded affirmatively to both questions, the officer asked [her], "Would you mind speaking with us outside in regards to a complaint received?" … [Appellee] cooperated and agreed to speak with the officers outside.

[Appellee] got up out of her chair and walked out of the restaurant of her own accord, escorted by [Officer] Guica. She had no trouble getting up out of her chair. During the entire time [Officer] Guica observed [Appellee] in the restaurant and as she exited the restaurant, [Appellee] exhibited no balance, coordination or dexterity problems. She did not sway or stumble.

Once in the parking lot, the officers told [Appellee] they had received a complaint about an erratic driver who was possibly intoxicated. [Appellee] told the officers she had two glasses of wine at her residence prior to arriving at Valerio's. [Officer] Guica testified he could smell the odor of an alcoholic beverage. [Officer] Guica noted no signs of coordination, dexterity or balance problems. Although [Officer] Guica initially testified he noted an apparent speech defect while [Appellee] was outside the restaurant, he testified the defect was not

significant enough for him to remember and record in the official report he prepared.

[Officer] Guica asked [Appellee] to participate in the following field sobriety tests: reciting the alphabet, the one leg stand test, the walk and turn test, and a [portable breathalyzer test (PBT)]. [Appellee] was clearly upset over the entire situation. She maintained she was not intoxicated and declined to perform each test.

After [Appellee] refused the PBT, [Officer] Guica arrested her for [driving under the influence of alcohol (DUI)].

[Officer] Guica transported [Appellee] to a local hospital for a blood draw. [Officer] Guica read the **O'Connell**[2] warnings to [Appellee] at the hospital. [Appellee] consented to the blood draw, which occurred at approximately 8:56 p.m. [Appellee] was charged by summons on June 24, 2013.

…

[Appellee] was charged with [DUI] – General Impairment (Incapable of Safe Driving); [DUI] – Highest Rate of Alcohol (BAC 0.16% or Higher); and Driving on Roadways Laned for Traffic, a summary offense. [Appellee] filed an Omnibus Pre-trial motion on December 3, 2013[,] and Supplemental Omnibus Pre-Trial Motion on December 10, 2013, seeking suppression of the blood alcohol evidence.

…

A hearing on [Appellee's] Suppression Motion was held on January 15, 2014. The Suppression Motion was granted on January 17, 2014. The Commonwealth filed a notice of appeal on February 12, 2014.

Suppression Court Opinion (SCO), 5/30/14, at 1-5 (footnotes and citations to the record omitted).

---

[2] **Commonwealth v. O'Connell**, 555 A.2d 873 (Pa. 1989).

The Commonwealth filed a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, it raises the following question for our review:

> Did the suppression court err and/or abuse its discretion by granting [Appellee's] Motion to Suppress Evidence where a Millcreek Township police officer properly engaged in a mere encounter with [Appellee] at Valerio's [R]estaurant after speaking with a known citizen who had witnessed [Appellee] driving her vehicle, at which time he gleaned information that led him to formulate reasonable suspicion and eventually probable cause to believe [Appellee] was unlawfully driving under the influence of alcohol, leading to the lawful arrest of [Appellee] for Driving Under the Influence of Alcohol?

Commonwealth's Brief at 4.

We begin our assessment of the Commonwealth's claim by noting our scope and standard of review:

> When reviewing an Order granting a motion to suppress we are required to determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn by the suppression court from those findings are accurate. In conducting our review, we may only examine the evidence introduced by [the] appellee along with any evidence introduced by the Commonwealth which remains uncontradicted. Our scope of review over the suppression court's factual findings is limited in that if these findings are supported by the record we are bound by them. Our scope of review over the suppression court's legal conclusions, however, is plenary.

***Commonwealth v. Gutierrez***, 36 A.3d 1104, 1107 (Pa. Super. 2012) (quoting ***Commonwealth v. Henry***, 943 A.2d 967, 969 (Pa. Super. 2008) (citations omitted)).

Here, the Commonwealth first disputes the suppression court's determination that "[a]n investigative detention of [Appellee] occurred inside

- 5 -

Valerio's Restaurant, after [Appellee] was approached by Officer Guica and asked to step outside." SCO at 6. The Commonwealth also disagrees with the suppression court's alternative conclusion that, "[a]ssuming *arguendo* an investigative detention of [Appellee] did not occur inside the restaurant, then it occurred the moment she stepped outside the restaurant into the parking lot where three marked Millcreek Township Police cruisers were parked and other Millcreek Township Police officers were located." *Id.* at 7. Instead, the Commonwealth maintains that Appellee was not detained until "Officer Guica requested that [Appellee] perform field sobriety tests…." Commonwealth's Brief at 13.

In **Commonwealth v. Ellis**, 662 A.2d 1043 (Pa. 1995), our Supreme Court explained the "three categories of interactions between citizens and the police." *Id.* at 1047.

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. **See Florida v. Royer**, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); **Florida v. Bostick**, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. **See Berkemer v. McCart**y, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); **Terry v. Ohio**, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Finally, an arrest or "custodial detention" must be supported by probable cause. **See Dunaway v. New York**, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); **Commonwealth v. Rodriquez**, 532 Pa. 62, 614 A.2d 1378 (1992).

*Id.* at 1047-1048 (footnote omitted). Pertinent to the instant case is the distinction between a "mere encounter" and an "investigative detention." On this issue, our Court has stated:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct could have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter.

*Commonwealth v. Martin*, 705 A.2d 887, 890-891 (Pa. Super. 1997).

The facts of *Martin* closely mirror those in the present case. There, a police detective received an anonymous tip that Martin was selling drugs at a café. *Id.* at 890. Upon arriving at the café, the detective approached Martin, "asked if he could speak with him[,] and asked [Martin] 'to step outside.'" *Id.* Martin "said, 'Okay[,]'" and "then walked out of the café and into an adjacent public parking lot." *Id.* We concluded that this interaction constituted a mere encounter, stating:

> We find that [Martin] was not seized by [the] [d]etective … when he initially exited the café. Prior to leaving the café, [Martin] was not questioned extensively by [the] [d]etective …. Rather, the detective merely approached [Martin], indicated that he would like to speak with him and asked him if he would "step outside." There is no indication that [Martin] was told that he was required to leave the café. Rather, the detective simply asked for his cooperation. *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984) (per curiam) ("The initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly [a] consensual encounter."). Moreover, [the] [d]etective … approached and spoke to [Martin] in a non-threatening manner. There were neither threats nor any show of force. There was no evidence of any attempts at coercion or intimidation by the

detective. Accordingly, we find that [Martin] left the café voluntarily, and, therefore, that he was not "seized." ***See Sibron v. State of New York***, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

***Id.*** at 891 (footnote omitted).

Here, Officer Guica testified at the suppression hearing that he entered Valerio's Restaurant and saw Appellee sitting at a table. N.T., 1/15/14, at 37. He approached her and asked if her "Chrysler Crossover" was parked outside, to which Appellee "said, yes…." ***Id.*** at 38. The officer then asked Appellee if her name was Gladys Ramaekers, and Appellee again "said, yes." ***Id.*** Officer Guica then asked Appellee if she "would … mind speaking with us outside in regards to a complaint received…." ***Id.*** Officer Guica testified that Appellee "cooperated, complied, and walked outside…." ***Id.*** The officer stated that he at no point put his hands on Appellee to escort her outside. ***Id.*** at 39. Instead, Appellee "walked on her own" out of the restaurant. ***Id.***

As in ***Martin***, we conclude that Officer Guica's interaction with Appellee inside the restaurant was a mere encounter. While Officer Guica asked Appellee questions regarding her name and vehicle, and stated that police had received a 'complaint,' the officer did not say anything specific enough to indicate to Appellee that she was suspected of driving under the influence of alcohol. Instead, he merely asked her to step outside to speak with him. There is no indication that the officer told Appellee that she was required to come outside, that he spoke to her in a threatening or coercive manner, or that he physically escorted her from the restaurant. Accordingly, as in ***Martin***, we conclude that Officer Guica's interaction with Appellee

- 8 -

inside Valerio's Restaurant constituted a "mere encounter" requiring no quantum of suspicion on Officer Guica's part.[3]

Next, we must assess the suppression court's alternative conclusion that Appellee was seized when she stepped outside the restaurant and into the parking lot. In reaching this determination, the suppression court emphasized that Appellee was confronted in the parking lot by "three marked Millcreek Township Police cruisers … and other Millcreek Township Police officers…." SCO at 7. The court reasoned that "[o]nce outside for questioning, in the presence of uniformed officers and marked police cruisers in the restaurant parking lot, [Appellee] was under an official compulsion to respond." *Id.* at 7-8.

In disputing the court's determination that Appellee was seized at this point, the Commonwealth initially challenges the court's factual finding that multiple police officers and police cruisers were parked outside when Appellee exited the restaurant. The Commonwealth states:

> There was no testimony whatsoever at the suppression hearing as to how many police cruisers or police officers remained in the restaurant parking lot at the time Officer Guica and [Appellee] came outside. Although there was testimony that three marked

_____

[3] We acknowledge that unlike the plain-clothed detective in *Martin*, Officer Guica was in full uniform. However, in *Martin*, the detective was familiar with Martin from prior interactions; thus, as in the present case, Martin knew he was being approached by a police officer. *See Martin*, 705 A.2d at 890 (stating that the detective "knew Martin" from prior interactions, and addressed Martin by his first name inside the café).

cruisers had been there initially, there was no testimony relating to when those cruisers and officers left the scene.

Commonwealth's Brief at 13.

We disagree with the Commonwealth's argument. It is undisputed that multiple officers were present when Officer Guica went into the restaurant to locate Appellee. Once inside, Officer Guica asked Appellee if she would "mind speaking with **us** outside" and testified that Appellee "agreed to speak with **us**." N.T. at 38 (emphasis added). The officer further testified that once outside, "***[w]e*** told [Appellee] that, you know, this department received a complaint about an erratic driver, possibly intoxicated driver, [and] inquired whether or not she had been drinking prior to her arrival to the restaurant." ***Id.*** at 39 (emphasis added). These portions of the record support the suppression court's factual finding that there were multiple officers and marked patrol cars present in the parking lot when Appellee exited the restaurant with Officer Guica.

Additionally, we ascertain no error in the suppression court's legal determination that Appellee was seized once she exited the restaurant and was questioned by the officers. Again, ***Martin*** is instructive. After Martin "exited the café, he was immediately confronted by two additional officers, both of whom were in uniform. [The] [d]etective … then informed [Martin] that the police came to the café because they received a tip that he was selling drugs." ***Martin***, 705 A.2d at 891. Based on these circumstances, we found that Martin was seized, reasoning:

> As in **Commonwealth v. Wright**, 448 Pa. Super. 621, 672 A.2d 826, 829 (1996), we find that "the combination of the threatening presence of several officers and the indication that appellant was suspected of criminal activity [requires the conclusion that] a reasonable person would believe that he was not free to leave." A statement by a law enforcement official that a person is suspected of illegal activity is persuasive evidence that the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution have been implicated. **Florida v. Royer**, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (White, J., plurality); **Wright, supra**. We believe that [Martin] could conclude reasonably that the police suspected him of selling illegal narcotics based on the detective's recitation of the anonymous tip and that he could conclude reasonably that he was not free to leave. Accordingly, we find that [Martin] was seized by the police when he was questioned in the parking lot. **See Commonwealth v. Lewis**, 535 Pa. 501, 636 A.2d 619 (1994) (holding that appellant was seized where he was confronted by four officers who indicated that they were "working narcotics" and were part of a drug interdiction program); [**Interest of**] **Jermaine**, [582 A.2d 1058 (Pa. Super. 1990)] (indicating that the threatening presence of several officers and unsupported accusations of criminal activity constitute a "seizure").

**Id.** at 891.

Similarly, here, when Appellee exited the restaurant, she was confronted by several uniformed police officers. Officer Guica then informed Appellee that they had "received a complaint about an erratic driver, possibly intoxicated driver." N.T. at 39. Officer Guica then asked Appellee "whether … she had been drinking prior to her arrival to the restaurant[,]" **id.**, thereby indicating to Appellee that she was the person they suspected of driving under the influence of alcohol, and that she was not free to leave. Thus, at that point, Appellee was seized.

- 11 -

Next, we must determine if the officers possessed reasonable suspicion to validate Appellee's seizure. After careful review, we conclude that they did not. As the suppression court points out,

> [t]he information the police received that [Appellee] may have been drinking came from the unidentified first driver, as conveyed through Cavanagh. The reliability of that information of the unidentified first driver is low and could not be tested. The basis for the first driver's alleged comment as relayed by Cavanagh is speculative. Cavanagh possessed no independent information concerning any alcohol consumption by [Appellee], and only observed [Appellee] allegedly back up next to her vehicle, then pull ahead when the traffic light turned green. During the several miles Cavanagh followed [Appellee's] vehicle, Cavanagh observed absolutely no abnormal driving activity on the part of [Appellee]. All the police knew at the time [they arrived at the restaurant] was [that Appellee] was the owner of a certain registered vehicle in the parking lot, [Appellee's] identity, the report by Cavanagh that [Appellee] allegedly backed up her vehicle next to Cavanagh's on West 8th Street, and the information from the unidentified first driver as relayed by Cavanagh.

SCO at 7. When Officer Guica approached Appellee inside the restaurant, she fully complied in responding to his questions and his request that she step outside to speak with him. N.T. at 38. The officer testified that Appellee rose from her chair and walked out of the restaurant "of her own accord," without swaying or stumbling. *Id.* at 64. Officer Guica conceded that he did not "notice any dexterity, coordination or balance problems at all" while interacting with Appellee inside the restaurant. *Id.*

The Commonwealth maintains that "Officer Guica smelled the odor of an alcoholic beverage coming from [Appellee], he observed her to have glossy eyes and slightly slurred speech, her answers to his questions were

discombobulated and non-responsive, she could not recall (or claimed not to recall) engaging in any type of erratic driving behavior, and [she] admitted she had consumed two glasses of wine prior to driving." Commonwealth's Brief at 12. However, these observations were all made *after* Officer Guica detained Appellee. Namely, Officer Guica testified that he "could smell the odor of an alcoholic beverage" on Appellee after he escorted her outside, informed her that they were investigating a "possibly intoxicated driver," and asked her if she had anything to drink. N.T. at 39. Further, it was during the officer's ensuing questioning of Appellee that he observed that she had glossy eyes, her speech "was a little bit slurred[,]" and "[h]er responses to the questions were a little … discombobulated…." *Id.* at 41-42. Again, these observations by Officer Guica all took place after Appellee was detained and, therefore, the suppression court properly declined to consider them in determining if the officer possessed reasonable suspicion to seize Appellee.

In sum, we conclude that the record supports the suppression court's factual findings, and the court did not err in determining that Appellee was detained at the point when she emerged from the restaurant with Officer Guica to find several police officers in the parking lot, was informed that the officers were investigating a possible DUI, and was asked if she had consumed any alcohol prior to arriving at the restaurant. We also ascertain no error in the court's determination that the officers lacked reasonable

suspicion to justify Appellee's seizure at that point. Accordingly, we affirm the suppression court's order granting Appellee's motion to suppress.

Order affirmed.

Judge Stabile joins this memorandum.

Judge Mundy concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2015