UNITED STATES of America, Plaintiff,

v.

Cynthia Ericson ROWE, David M. Vogelstein, and Benton D. Burt, Defendants.

No. CR–87–0950 RFP.

United States District Court, N.D. California.

May 6, 1988.

---

Joel Levin, Asst. U.S. Atty., San Francisco, Cal., for plaintiff U.S.

Goeffrey Rotwein, Ruffin & Rotwein, San Francisco, Cal., for defendant Cynthia Rowe.

Kim Kruglick, Mill Valley, Cal., for defendant David Vogelstein.

Tony Tamburello, Tamburello, Hanlon & Bresciani, San Francisco, Cal., for defendants.

## ORDER GRANTING IN PART DEFENDANT ROWE'S MOTION TO SUPPRESS EVIDENCE

PECKHAM, Chief Judge.

## INTRODUCTION

This case stems from the mistaken release of Douglas Costa from state custody. Defendant Cynthia Rowe is charged with assisting in an escape, concealing a person from arrest, harboring an escaped prisoner, and making false statements during an investigation. The defendant has moved for the suppression of statements she made on December 7, 1987, during the search of her apartment. The defendant also moves for the suppression of evidence seized during that search and a subsequent search of a safe deposit box. For the reasons stated below, the motion will be granted in part.

## FACTS

An evidentiary hearing was held on March 24, 1988 concerning the events of December 7, 1987. The hearing revealed the following facts. On December 2, 1987, Douglas Costa was mistakenly released on bail from state custody. The defendant posted $20,100 in cash in order to obtain a bond for Costa's release. Costa failed to appear for a hearing on December 4, 1987, and federal and state warrants were issued for his arrest.

Federal investigators interviewed an employee of the bail bond agency on December 4. During this interview, the investigators learned that defendant Cynthia Rowe had posted bail for Costa. They were also told that Costa and the defendant had exchanged kisses and romantic embraces when Costa had been released from custody. The agents investigating Costa's disappearance were informed by agents in Texas that Costa had a girl friend in San Francisco named Cynthia who served as a message center for Costa's drug distribution efforts. On one occasion, Costa had placed a telephone call in the presence of an undercover agent during which he directed Cynthia to deliver a kilogram of cocaine to a location in San Francisco.

On December 5, 1987, the agents began a surveillance of the defendant at her address of 2186 Bush Street. They observed a van moving furniture to an apartment located two blocks away at 2212 Pine Street. Based on the information they had developed during their investigation, the agents obtained search warrants for both addresses. The search warrants authorized the seizure, *inter alia,* of Douglas Costa and all evidence pertaining to his

release and flight. Significantly, the items were sought both in order to determine the whereabouts of Costa and as evidence against the defendant for the crimes of harboring and aiding and abetting an escape.

Among the agents who executed the search warrants were Inspector John Stafford, who was in charge, and Agent Zane Roberts. These two agents gave the following incontroverted account of the search at the hearing.

At 6:10 in the evening of December 7, 1987, several agents went to 2212 Pine Street in order to execute the first of the two warrants. The agents rang the doorbell and identified themselves as federal agents in possession of a search warrant. The defendant initially refused to open the door. After several requests, plaintiff was told that the agents would kick the door in if it were not opened. She then opened the door. The officers entered the apartment and did a security sweep, to see if anyone else was present. The officers discovered the presence of defendant's niece, Cynthia Bosher. During this sweep, the defendant waited in a room immediately inside the entrance to the apartment ("the parlor room"). At one point, she was told to put her hands on her head. Soon thereafter, she was allowed to put her hands down when Inspector Stafford noticed that she had a lit cigarette in her hand. *See* Declaration of Inspector Stafford at 2–3.

After the sweep was completed, Inspector Stafford "had Ms. Rowe sit down in the parlor" and allowed her to examine the search warrant. *Id.* at 3. She was also escorted to the bathroom, where she was allowed to go to the bathroom in privacy. She then returned to the parlor room. For the balance of the evening, the defendant remained in the parlor room except for brief trips to the bathroom. Agent Roberts watched the defendant during most of the time she was in the parlor room. She was never told whether she was free to leave the apartment, and it appears that the agents would not have allowed her to leave had she asked to do so.

Approximately five minutes into the search, Inspector Stafford asked the defendant where her purse was. Inspector Stafford states that he asked for the purse in hopes of finding the keys to the apartment at 2186 Bush Street, so that he could more easily execute the second warrant. Ms. Rowe allegedly responded to this question nervously, and stated that she did not know where her purse was. Officer Hernandez located the purse on top of the dining room table. The purse was discovered to contain a large sum of cash and the keys to two safe deposit boxes. *See* Hernandez Declaration at 1–2. Given this development, Inspector Stafford decided to contact the U.S. Attorney's office for advice on how to proceed. Steve Graham, Chief of the Drug Task Force, arrived at the apartment at approximately 8:20.

Agent Roberts testified that approximately twenty minutes into the search, the defendant asked him for what items the agents were looking. Agent Roberts responded by giving the defendant a copy of the search warrant, which listed the items to be seized. After examining the warrant, the defendant stated that the warrant did not say that the agents could seize money. She then asked if the agents intended to seize her money. Agent Roberts responded that that was not up to him. Inspector Stafford would decide what to seize. The defendant then explained that she had just been to the bank and that she had a lot of money in her purse for Christmas presents. She stated that she always gave her mother and brother large amounts of cash for Christmas. (This last statement was later contradicted by a statement from defendant's mother.) At the time of this conversation, Agent Roberts did not know that the defendant's purse had already been located and did indeed contain a large amount of cash. Agent Roberts recounted the conversation to Inspector Stafford, who was aware of the contents of the purse.

At a later point in the evening, the defendant returned to the parlor room unobserved after one of her trips to the bathroom. Agent Roberts and Inspector Robert Hernandez, who had apparently been looking for the defendant in another part

of the apartment, returned to the parlor room and saw the defendant reaching into a closet. The defendant had her back turned to the agents, who could not see what she was trying to reach. Inspector Hernandez drew his gun and asked the defendant what she was doing. The defendant turned around and tried to conceal an object behind her back. The agents approached the defendant and removed the object from her hands. They discovered that the object was a yellow box containing business cards and phone numbers. At this point, without prompting from the agents, the defendant explained that she did not want the agents to get hold of her personal phone numbers. In order to prevent any further attempts to interfere with the search, the defendant was handcuffed. The handcuffs were removed approximately 15 minutes later, so that defendant could smoke. *See* Roberts Declaration at 2.

At approximately 9:25, Inspector Stafford began an interview of the defendant. The government concedes that the defendant was not advised of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before this interview. During the interview, the defendant made a number of statements which would prove useful to the government at trial. *See* Stafford Declaration at 6–7 (summarizing interview). The interview was terminated when the defendant asked to see an attorney.[1] After this interview, Steve Graham authorized the defendant's arrest.

## DISCUSSION

The defendant makes five attacks upon the legality of the search. First, she asserts that the agents improperly detained her while executing the search warrant. Second, she argues that her statements should be suppressed because she was not Mirandized. Third, she contends that the search of her purse was illegal, because it

was not authorized by the warrant. Fourth, she claims that the search of the safe deposit box was the fruit of the search of her purse and the illegal interview, and therefore should be held invalid. Finally, the defendant argues that the agents seized items that were not within the scope of the warrant.

### 1) Detention

The defendant's most sweeping argument is that the agents had no right whatsoever to detain her while they conducted the search. Thus her detention was an illegal seizure within the meaning of the Fourth Amendment. This argument, if accepted, would lead to the suppression of all statements made by the defendant during the search under the exclusionary rule. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

The Supreme Court has held that law enforcement officers may properly detain the occupants of a premises while conducting a search for *contraband*. *See Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). The *Summers* Court expressly reserved the question of whether detention would be justified if the search warrant authorized the seizure of evidence, rather than contraband. *See id.* at 705 n. 20, 101 S.Ct. at 2595 n. 20. The question remains open. *See Daniel v. Taylor*, 808 F.2d 1401 (11th Cir.1986).

The reasoning contained in the *Summers* opinion is a useful point of departure for resolving this open question.

The *Summers* Court began by considering the intrusiveness of the detention. The Court reasoned that (1) detention only adds minimally to the intrusion of the search itself, and most persons would prefer to remain to observe a search; (2) the police would not be likely to exploit or unduly prolong the detention to gain information; (3) a detention at home adds

1. In the defendant's moving papers, counsel claims that the defendant repeatedly asked for, and was denied, access to an attorney during the course of the search. No evidence to this effect was produced at the hearing. Even had such evidence been produced, the defendant's

allegations would not be very credible, in light of Inspector Stafford's assertion that the interview was ended the first time that the defendant asked for an attorney. Inspector Stafford's testimony was corroborated by Agent Roberts at the hearing.

only minimally to the public stigma associated with the search.

*Daniel,* 808 F.2d at 1403. These observations are equally true in the present case. The fact that agents are executing a warrant for evidence rather than contraband does not affect the intrusiveness of the detention.

Next, the *Summers* Court considered the law enforcement interests which would be served by permitting the detention: (1) preventing flight in the event that incriminatory evidence is found, (2) minimizing the risk of harm to the officials, and (3) facilitating the orderly completion of the search, inasmuch as the detained occupant may, out of self-interest, open locked doors or locked containers.

*Daniel,* 808 F.2d at 1404. Although these three interests may not be present in many cases where police are searching solely for evidence, they are present here. Given the defendant's close association with Costa, who had recently escaped from custody, the defendant was clearly a flight risk. Second, the agents had hoped to find Costa on the premises when executing the warrant. They therefore had a strong interest in maintaining order during the initial moments of the search, to avoid surprises and minimize the risk of injury to those present. Additionally, the defendant's presence might have proved useful in facilitating the search.

Finally, the *Summers* Court considered the nature of the articulable and individualized suspicion on which the police base the detention of an occupant of premises subject to search. According to the Court, the fact that a search warrant has been issued means that "[a] judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime." ... This rationale is not applicable to a

search for evidence, because the existence of mere evidence, as opposed to contraband, on the premises does not suggest that a crime is being committed on the premises.

*Id.* (quoting *Summers,* 452 U.S. at 703, 101 S.Ct. at 2594). It is true that a search for evidence will rarely give rise to an individualized suspicion that the occupant is committing a crime on the premises.[2] Under the *Summers* opinion, however, the presence of individualized suspicion was merely one factor to be considered in balancing the rights of the accused against the interests of the government. The fact that the individualized suspicion component is less in this case than it was in *Summers* "does not undermine the otherwise valid [government] interest in detaining [the defendant]." *United States v. Morales,* 611 F.Supp. 242, 245 (S.D.N.Y.1985).

The defendant argues, in the alternative, that even if a brief period of detention was justified, the detention in this case was so extensive as to be unreasonable. *See Summers,* 452 U.S. at 705 n. 21, 101 S.Ct. at 2595 n. 21 (stating that a prolonged detention might be invalid "in an unusual case"). We do not agree. Although the *Summers* Court did not define the duration of permissible detention, it apparently contemplated that occupants could be detained long enough for police to complete extensive searches. *See Daniel,* 808 F.2d at 1405. Moreover, within the first fifteen minutes of the search of the defendant's apartment, the agents had discovered the defendant's purse and its incriminating contents. Once this had occurred—if not before—the agents had probable cause to hold the defendant.

Considering the totality of circumstances surrounding the search, the detention of the defendant was nothing more than sound police practice. In reaching this conclusion, we are not suggesting a blanket

---

**2.** Interestingly, this case may be one of those rare exceptions. The warrant involved herein authorized the seizure of Douglas Costa, as well as the seizure of evidence relating to his escape. For the reasons stated in the affidavit in support of the search warrant, *see* Defendant's Brief at Exhibit A, the agents had cause to believe that Costa might be present at the defendant's apartment. Thus the agents had some "individualized suspicion" that the defendant was committing the crime of harboring Douglas Costa on the premises at the time they conducted their search.

extension of the *Summers* rule to all cases involving searches for evidence. We merely hold that, under the circumstances of this particular case, the detention of the defendant was reasonable.

### 2) Interrogation

■ The defendant's second major argument is that she was interrogated in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government conceeds that the defendant was not advised of her rights before she was interviewed by Inspector Stafford. Although we accept the agents' testimony concerning the events that preceded this interview as entirely true, we nevertheless conclude that the defendant is correct. The central holding of *Miranda* is that

> the prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of [her] freedom of action in any significant way.*

*Id.* at 444, 86 S.Ct. at 1612 (emphasis added).

The government argues that the defendant was validly detained under the rule of *Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981), which allows agents to detain the occupants of a premises while executing a search warrant. This argument misses the point. Although as is discussed in the previous section, the defendant's *detention* was justified under *Summers*, the subsequent *interrogation* of the defendant was not. The *Summers* opinion "nowhere suggests that the mere fact that a 'detention' [is] permissible for Fourth Amendment purposes [makes] it any less 'custodial' for *Miranda* purposes." *United States v. Morales*, 611 F.Supp. 242, 245 (S.D.N.Y.1985); *see United States v. Stevens*, 543 F.Supp. 929, 942–44 (N.D.Ill.1982).

The proper question, then, is whether the defendant was effectively in custody when she made the challenged statements. On the facts of this case, there is no doubt that she was. Before the defendant was interviewed by Inspector Stafford, she was detained for over three hours. During part of this time, she was handcuffed. She was not free to move about her apartment. Under these circumstances, the defendant might reasonably have concluded that she was not free to leave her apartment, *see United States v. Bekowies*, 432 F.2d 8 (9th Cir.1970), and indeed the agents testified that she probably would not have been allowed to leave. Furthermore, one purpose of the interview appears to have been to elicit damaging responses from the defendant, who at that time was very much the target of an investigation. *See Stevens*, 543 F.Supp. at 943. For these reasons, all statements made by Rowe during the interview with Inspector Stafford must be suppressed.

■ This ruling applies only to those statements made by the defendant in response to questioning by Inspector Stafford at the end of the evening. The defendant's inculpatory acts (e.g., her refusal to open the door and her attempt to hide the addresses) are admissible. Information volunteered by the defendant is also admissible. During the course of the search, the defendant volunteered statements about her reasons for having such a large amount of cash and her personal phone numbers. These statements were not prompted by government interrogation, or by the functional equivalent thereof. *See Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). For example, during the exchange with the defendant concerning the possible seizure of her money, Agent Roberts did nothing to elicit responses from the defendant. It was the defendant who initiated the conversation, and who eventually volunteered that the money was for Christmas presents. Indeed, Agent Roberts was not even aware that the defendant's purse contained a large sum of cash at the time the conversation took place. *See supra* at

**1426**

1422–23. This exchange was not an interrogation within the meaning of *Miranda.*

■ The defendant's statements regarding her purported lack of knowledge of the whereabouts of her purse are also admissible. This is so even though the statements were a direct response to Inspector Stafford's inquiry concerning the purse.

> Certainly not every question is an interrogation. Many sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent. A definition of interrogation that includes any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself.

*United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir.1981) (citing *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689). We share the Ninth Circuit's concern over

> the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect. Thus we emphasize that the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response.

*Id.* at 1238. After considering all of the facts surrounding Inspector Stafford's inquiry about the purse, *see supra* at 1422, we find that the question was not intended to elicit a damaging response, nor was it objectively likely to do so. Accordingly, the defendant's statements concerning the location of her purse will not be suppressed.

### 3) Other Arguments

■ The defendant also argued in her initial brief that the seizure of her purse was invalid. As the defendant points out, agents searching a premises cannot routinely search personal items such as purses or backpacks if those items are within the possession of the occupants. *See United States v. Robertson,* 833 F.2d 777, 783–86 (9th Cir.1987). This rule is inapposite in the present case, as the defendant's purse was not within her possession when it was seized. Therefore, the search warrant was adequate to support the seizure of the purse and its contents.

■ The Defendant's fourth argument is that evidence seized during the subsequent search of her safe deposit box was the impermissible fruit of the Stafford Interview. Even though certain of the defendant's statements must be suppressed, the search of the safe deposit box was valid. In *United States v. Patterson,* 812 F.2d 1188, 1193 (9th Cir.1987) the Ninth Circuit held that statements obtained in violation of *Miranda* could nevertheless be used to establish probable cause for a search warrant, so long as the statements were voluntary. *Patterson* is controlling.

■ Finally, the defendant argues that the agents seized items from her apartment, such as jewelry, which did not fall within the scope of the warrant, and that this seizure was without probable cause. The government responds, persuasively, that the agents did have probable cause to seize the items. The cash, jewelry, and other items were within the plain sight of the searching officers. Their evidentiary significance was obvious, given Costa's recent flight. *See Texas v. Brown,* 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (plurality opinion); *United States v. Washington,* 797 F.2d 1461, 1469 (9th Cir.1986). Therefore, seizure of these items was proper.

### CONCLUSION

The statements made by the defendant during the Stafford interview must be suppressed. The motion is denied in all other respects.

IT IS SO ORDERED.