**Lynn MEREDITH, et al., Plaintiffs,**

**v.**

**Andrew ERATH, et al., Defendants.**

**No. CV99–13100 FMC(MANx).**

United States District Court,
C.D. California.

Sept. 19, 2001.

Lynne Meredith, Sunset Beach, CA, pro se.

Gayle Bybee, Sunset Beach, CA, pro se.

Jenifer Meredith, Sunset Beach, CA, pro se.

Bernadette Keller, Sunset Beach, CA, pro se.

Carla Figaro, Sunset Beach, CA, pro se.

Edward M. Robbins, Jr., Darwin Thomas, Richard G. Stack, AUSA Office of U.S. Attorney Tax Division, Los Angeles, CA, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COOPER, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment. The Court deems this matters appropriate for decision without oral argument. See Fed.R.Civ.P. 78; Local Rule 7.11. After considering all relevant filings from all parties, the Court issues the following decision.

### I. Introduction

On July 10, 1998, agents from the Internal Revenue Service ("the IRS") executed simultaneous searches of two properties owned by plaintiff Lynne Meredith ("Meredith") pursuant to a court-issued search warrant. Defendants searched Meredith's home and place of business, located at 16585 Pacific Coast Highway, Sunset Beach, California (the "Sunset Beach prop-

erty"). Defendants also searched a second residence where Meredith's daughter, plaintiff Jenifer Meredith ("Jenifer") resided, located at 16963 Roundhill Drive, Huntington Beach, California (the "Huntington Beach property"). At the time the searches were conducted, plaintiff Gayle Bybee ("Bybee") resided at the Sunset Beach property. Plaintiff Bernadette Keller ("Keller"), Meredith's mother, was present at the Sunset Beach property on the day the search warrant was executed. Plaintiff Carla Figaro ("Figaro") did not reside at either but was employed by Meredith and worked at the Sunset Beach property.

The remaining claims in this action involve, in one way or another, the manner in which the search warrants were executed at the Sunset Beach property and the Huntington Beach property. Plaintiffs allege that defendants violated their constitutional rights by failing to knock and announce before entering the properties, by failing to present the search warrant immediately upon the request by the occupants of the properties, by using excessive force in executing the warrants, and by unconstitutionally detaining the occupants of the properties.

Defendants have moved for summary judgment as to all claims, and argue that they are entitled to qualified immunity as to all these claims. They are only partly correct.

### II. Factual Background

Many of the facts at issue in this action are disputed. The relevant factual background, as well as the relevant factual disputes, may be summarized as follows.

#### A. Sunset Beach Property

##### 1. Second–Floor Entry

Plaintiff Keller testified that she was at her desk in the second floor office when a

man came in with a rifle or shotgun and pointed it at her. Defendants dispute that any firearms other than handguns were present at the property. Keller testified that there was another man behind the one with the gun, and that he carried a battering ram or an ax. These men told her they wanted her keys. Keller testified that the men did not identify themselves as federal agents, and the fronts of their raid jackets contained no identifying marks. Keller testified that later she saw the writing on the backs of the agents' jackets that identified them as federal agents. The agents questioned her, but no one told her they had a warrant. Agent Mazon's testimony confirms that no one on the second floor was served with a search warrant. Keller was eventually told that she was free to leave, but because her daughter, Meredith, was still upstairs, she elected to stay the entire day.

Plaintiff Carla Figaro also testified regarding the raid team's entry into the second-floor office. Figaro testified that she became aware that police were entering the office, and she approached the door of the room she was in on the second floor. It had been her intention to go to the third floor to check on Meredith and Bybee. She was approached by an agent, who pointed a gun at her and ordered her to back up and get back into the room. Figaro does not recall how long the gun was pointed at her. Figaro was detained in an office or room with other employees, but was taken to another room to be interviewed by agents separately from the other employees. Figaro observed the other employees being taken to separate offices as well, and she assumed that those employees were also being interviewed. Figaro was not told she was free to go until some time after noon. Although she did not ever ask if she was free to go, another employee did ask, and was told by the agents that the employees could leave when the agents were finished. The em-

ployees were not permitted to answer the phone. Figaro, when faced with nature's call, had to ask to use permission to use the restroom, and was escorted to the restroom and back by an agent.

### 2. Third–Floor Entry

Plaintiff Bybee testified that Defendant Special Agent Erath ("Erath") and the raid team came through the door to the third floor residence without knocking or announcing. Bybee also testified that one of the doors of the double doors to the residence (accessed from the second floor office) was open. Plaintiff Lynne Meredith testified that she did not hear the agents knock or announce their presence before entering the third floor.

Erath testified that he knocked on the outside of the door to the third floor, waited about three or four seconds, and then entered. Agent Erik Newberry testified that he heard Erath state that they were "Federal agents with a search warrant" at least once. He stated that the door was open, and that the raid team went in. Agent Kenneday testified that Erath announced that they were special agents with a warrant, and that at least five seconds passed before they entered.

Kenneday testified that the front of the raid jacket is embroidered with "IRS POLICE."

### 3. Bybee's Request for Search Warrant and Subsequent Detention

Upon the team's entry into the third floor, it is undisputed that they almost immediately encountered Bybee, who was carrying either a box or a crate and who repeatedly demanded to see the search warrant. The agent in charge, Erath, did not have a copy of the search warrant because it had been left in the car.

Bybee called, loudly, for plaintiff Lynne Meredith, expressing her concerns that the

search was illegal, that the officers had not shown her a search warrant, and that the ongoing situation was, in her assessment "just like Ruby Ridge."[1] It is undisputed that Erath forced Bybee to the ground in his attempt to control and handcuff her. Erath himself testified that he did so notwithstanding the fact that he did not find Bybee threatening.

Bybee testified that she did not try to flee from the officers, but that Erath grabbed her arms and caused extensive bruising. Bybee admits she resisted being handcuffed by pulling her arms and legs into her body. Bybee denies having struck Erath or any other officer. Erath's post-search interview reiterated Bybee's account that she did not strike Erath, and that she "curled up in a ball" and passively resisted his attempts to handcuff her. Agent Kenneday testified that he saw Bybee in a prone position on the floor with agents holding her down. Kenneday did not see or hear her struggling, although she was calling for plaintiff Lynne Meredith and repeating that the agents had no right to be there. By Kenneday's account, Bybee continued to ask for the search warrant while in this prone position.

Agent Sparkman's account of handcuffing Bybee differs from that offered by Bybee and the other agents. Sparkman testified that she was on the second floor of the Sunset Beach property when she heard screaming and ran to investigate. She saw Bybee fighting with Erath; Erath had Bybee in a "bear hug" and was trying to control her. Sparkman saw Bybee hitting and kicking Erath. Sparkman was concerned that Bybee was attempting to take Erath's gun from him. Sparkman characterized Bybee's resistance to being handcuffed as active, rather than passive, resistance.

Bybee testified that the defendants detained her for over thirty minutes in tight handcuffs. Agent Molt indicated in a post-search interview that she checked the handcuffs after Bybee complained they were too tight and found them to be sufficiently loose. Agent Sparkman loosened Bybee's handcuffs, even though she believed they were loose enough already. Sparkman also "double-locked" the handcuffs in order to keep them from inadvertently tightening. Bybee acknowledges in her deposition that the handcuffs were eventually loosened after she complained they were too tight.

Erath testified that Bybee was initially handcuffed to maintain control over her while the raid team searched for weapons; however, Bybee remained handcuffed for up to thirty minutes because she had not calmed down. After Bybee was released from the handcuffs, she stayed in the third-floor residence reading a book for four or five hours, even after she was informed she was free to go.

Erath testified that he did not take his gun out of its holster when he was on the third floor. Agent Kenneday's testimony controverts this fact; he testified that Erath had his gun drawn when he entered the third floor.

### 4. Encounter with Lynne Meredith

The raid team also encountered Lynne Meredith upon their entry on the third floor. The team's encounter with Meredith was less eventful. Agent Molly Molt and another agent encountered Meredith in a closet where Meredith was getting dressed. Agent Molt informed Meredith that she was a special agent with the IRS, that she had a search warrant, and that Meredith needed to get dressed. Mere-

---

1. Bybee was referring to a 1992 incident involving the FBI's attempts at executing an arrest warrant. The facts surrounding the now infamous Ruby Ridge incident are summarized in *Idaho v. Horiuchi,* 253 F.3d 359 (9th Cir.2001) (en banc).

dith asked to see the warrant, and Molt went to get a copy of the warrant.

Meredith testified that the two agents came running with their guns drawn, asking if she had any guns. Meredith informed them that they had no weapons.

Meredith then saw Bybee in the hallway in handcuffs and heard Bybee screaming her name. The agents took Bybee to one room and Meredith to another in an unfruitful attempt to interview them. Meredith again asked for a search warrant. Meredith was finally provided with a copy of the warrant about forty minutes after the raid team's entry.

Some time after lunch, Meredith was told she was free to leave. Before that time, Meredith was not allowed to go down to the second floor and was not permitted to answer the phone.

### 5. Agents' Identification

Meredith did not at first realize that the agents were from the IRS; although their raid jackets had "IRS" on the back of them, she saw no insignia or badges on the front of the jackets, and she was looking for badge numbers.

The declaration of Agent Sparkman controverts this testimony. Sparkman testified that before executing the search warrant, the agents changed into their government-issued clothing: Navy blue jacket with bright yellow embroidery and lettering; front lapel/pocket area with a bright yellow embroidered version of the official badge, 3 or 4 inches high: "Criminal Investigation, Dept of Treasury, U.S. Special Agent." Sparkman indicated that the back of the jacket has two-inch high letters and reads: "POLICE, U.S. AGENT." Other agents offered similar testimony.

### B. Huntington Beach Property

The agents also executed a search warrant at the residence of Lynne Meredith's daughter, Jenifer Meredith, in Huntington Beach.

### 1. Initial Entry

It is undisputed that the agents knocked on the exterior door of the Huntington Beach property. Leah Potter, who is not a party to this action but who was present at the property when it was searched, testified that she was asleep, but heard Jenifer's three dogs barking and then heard "Boom, boom, boom. Police. Open up." Leah estimated that ten to twenty seconds elapsed between the time the agents first knocked and when they entered. Leah went into the hall and raised her hands. She saw six to eight men with guns pointed at her, yelling, asking who was in the house. She did not see any badges on the agents' jackets. They yelled at her to get outside. She was wearing only her underwear, and asked if she could get her clothes. She was told she could not. Another occupant was eventually permitted to retrieve a sweatshirt for Leah. The occupant was also eventually permitted to retrieve an inhaler from Leah's purse to help alleviate Leah's subsequent asthma attack. Agent Nichols testified that he doesn't remember that anyone was outside the residence who was not fully dressed.

Britaney Guenther, who is also not a party to this action but who was present at the property when it was searched, testified that she woke to the sound of pounding. Leah was telling her to wake up because Leah thought that the police were at the residence. Britaney put on clothes and walked outside with her hands up. She testified that there were six to seven guns pointed at her.

Krista Trust, who is also not a party to this action but who was present at the property when it was searched, testified that she heard a loud pounding and heard

"Police. Open up." She testified that several agents, at gunpoint, ordered her to put her hands up and get out of the house. Krista testified that less than thirty seconds elapsed between the time the agents knocked and when they entered.

### 2. Encounter with Jenifer Meredith

Jenifer Meredith apparently did not hear the team's initial entry into her residence. It is uncontroverted that Jenifer was sleeping, unclothed, in her bedroom when the team made its entry. It is uncontroverted that she heard men's voices yelling her name, telling her to get up and get out of the house. It is uncontroverted that at least four men were standing over her bed with guns pointed at her.

Jenifer testified that she was frightened and asked them why they were there, but that the men did not answer her question and did not identify themselves as federal agents. Agent Nichols testified that when he entered Jenifer's bedroom, he would have announced who he was and that he had a warrant, because that's what they always say.

It is uncontroverted that the agents would not leave or turn around to allow her to get dressed in privacy, despite Jenifer's insistence that they do so.

Agent Nichols testified that, although there was a female agent at the scene, outside the residence, he was not willing to get the female agent to come to Jenifer's bedroom to guard Jenifer while she got dressed. Agent Nichols testified he did not do so because his initial concerns upon entry, securing the residence, had not yet been satisfied. Agent Nichols testified that he handed Jenifer an article of clothing, but that he couldn't remember what the article of clothing was. Jenifer testified that she picked up some pants from the floor, or they were handed to her, and she dressed under the covers. All the while, the agents kept their guns pointed at her. After she was dressed, the agents took her outside.

As soon as Jenifer realized that the agents were not burglars, but were from the IRS, she asked for a search warrant. She was not ever provided with one. Agent Nichols testified that he does not recall if he had a copy of the search warrant on his person when he entered the bedroom, nor does he recall if Jenifer ever requested to see a copy of the search warrant. Britaney's, Leah's, and Krista's testimony is consistent with Jenifer's. Britaney testified that she heard Jenifer screaming and crying, asking for a search warrant. Leah testified that Jenifer asked to see the search warrant and the agents said "no."

Jenifer testified that the agents did not knock on her bedroom door before they entered; instead, they kicked in the door. Agent Nichols testified that he doesn't think they kicked in the door, but he's not sure. Britaney testified that she did not hear Jenifer's door being kicked in, but she saw a footprint on the door, and the wood was cracking up on the sides. She was unable to close the door as a result. Leah's testimony is consistent with Britaney's. Leah testified that Jenifer's door looked as if it had been kicked in because there were big black shoe marks on the bottom of the door.

### 3. Detention of the Occupants

Britaney testified that they were kept out of the residence for about an hour. Leah Potter testified that Jenifer wanted to go to her mother's house, but the agents said, "You don't want to go there right now" and started chuckling about it. Agent Burget testified that he was instructed to watch over four or five female occupants who were brought out of the Huntington Beach property. Agent Bur-

get told the occupants that they could not go back inside until the house was secured.

## III. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Pro. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

## IV. *Bivens'* Claims and Qualified Immunity

■■■ In the absence of either a statutory prohibition against the relief sought or an exclusive statutory remedy, "the Constitution may support a private cause of action against federal officials acting under color of their authority for their constitutional torts ...," commonly referred to as *Bivens'* claims. *Hicks v. Small, M.D.*, 69 F.3d 967, 969 (9th Cir. 1995) (citing *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 394, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)). Under limited circumstances, a federal official may be liable for the violation of another's constitutional right where that right is clearly established and where a reasonable person would have been aware that the conduct in question violated that right. *Bivens*, 403 U.S. at 388, 91 S.Ct. 1999. To state a *Bivens* claim, plaintiffs must allege a specific deprivation of constitutionally protected rights through particular allegations of fact regarding a defendant's conduct. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

■■■ Qualified immunity shields public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Brewster v. Board of Educ.*, 149 F.3d 971, 977 (9th Cir.1998). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law .... [I]f officers of reasonable competence could disagree on th[e] issue [whether a chosen course of action is constitutional], immunity should be recognized.'" *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Brewster*, 149 F.3d at 977 (9th Cir.1998).

█ In order to establish whether the defendants should receive qualified immunity, the Court must consider (1) whether the law governing the official's conduct was clearly established and (2) whether, given this clearly established standard, a reasonable officer could believe that his or her conduct was lawful. *Ortega v. O'Connor,* 146 F.3d 1149, 1154 (9th Cir.1998). Qualified immunity is an issue for the Court, not the jury, and is to be resolved prior to trial. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *Anderson v. Creighton,* 483 U.S. 635, 645, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987).

█ "A court required to rule upon the qualified immunity issue must consider . . . this threshold question: taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If the plaintiff's allegations, taken as true, do not establish violation of a constitutional right, there is no need for further inquiry on the issue of qualified immunity. On the other hand, if plaintiff's version of the facts makes out a constitutional violation, the next step is to ask whether the right was clearly established. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad, general position." *Id.*

In this case, plaintiffs contend that their Fourth Amendment right to be free from unreasonable searches and seizures was violated in four distinct ways.

## V. Knock and Announce

█ The knock and announce statute, 18 U.S.C. § 3109, requires that an officer seeking to enter a house to execute a warrant must give notice of his purpose and authority, and he must be refused entry before forcibly· entering the house:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109. The statute codifies the common law rule of announcement, which the Supreme Court has held to be "an element of the reasonableness inquiry under the Fourth Amendment." *United States v. Ramirez,* 523 U.S. 65, 73, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (internal quotation omitted). Law enforcement officers may be excused from the knock and announce requirement only when they are faced with exigent circumstances that support "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

█ A refusal to reply to an officer's order to "open up" can be implied from silence. *United States v. Mendonsa,* 989 F.2d 366, 370 (9th Cir.1993). Exigent circumstances may excuse failure to wait for the occupant to refuse entry, but absent exigency, there must be explicit refusal or lapse of a significant amount of time before officers may forcibly enter the premises. *Id.*

█ What constitutes "a significant amount of time" between announcement and entry depends upon the circumstances of each case. *Id.* If officers have knocked and announced properly, mild exigency justifies simultaneous entry if it occurs without destruction of property. *Id.* When physical destruction of property is necessary to gain entry, more specific inferences

of exigency are required.[2] *Id.* Forced entry within three to five seconds is permissible when specific inferences are present. *See, e.g., McClure v. United States,* 332 F.2d 19, 21–22 (9th Cir.1964) (four to five second wait sufficient when officers heard "footsteps running in the wrong direction"), *cert. denied,* 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963 (1965); *United States v. Augello,* 368 F.2d 692, 693–95 (3d Cir.1966) (forced entry within four to five seconds of announcement permissible when sister ran away from door calling name of subject of warrant), *vacated on other grounds sub nom. DeCesare v. United States,* 390 U.S. 200, 88 S.Ct. 900, 19 L.Ed.2d 1036 (1968). An unjustified, yet sincere, belief in exigent circumstances does not justify non-compliance with § 3109. *Mendonsa,* 989 F.2d at 370.

 The raid team's entry into the second-floor office of the Sunset Beach property did not violate the knock and announce rule. It is uncontroverted that the office was "open for business" at the time of the execution of the search warrant. *See United States v. Little,* 753 F.2d 1420, 1435–36 (9th Cir.1984) (holding that there is no duty to knock and announce upon entering an open business or office). Accordingly, the agents are entitled to qualified immunity as to their actions in entering the second-floor office.

 Likewise, there was no violation of the knock and announce rule with respect to the team's entry to the third floor. It is undisputed that there is no duty to knock and announce before entering an open door. *See United States v. Phillips,* 149 F.3d 1026 (9th Cir.1998), *cert. denied,* 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); *United States v. Valenzuela,* 596 F.2d 1361, 1365–66 (9th Cir.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979). Moreover, Erath testified that he believed that the third floor was merely an extension of the second-floor office, and that the agents were unaware that the third floor served as a residence. Accordingly, the agents are entitled to qualified immunity as to their actions in entering the third-floor residence.

 Finally, there was no violation of the knock and announce rule with respect to the raid team's entry into the Huntington Beach property. It is uncontroverted that the agents waited at least ten seconds after knocking before entering the Huntington Beach property. Generally, a delay of five seconds or less after knocking and announcing has been held a violation of the knock and announce rule. *See, e.g., United States v. Mendonsa,* 989 F.2d 366, 370 (9th Cir.1993) (waiting 3 to 5 seconds was insufficient); *United States v. Moore,* 91 F.3d 96, 98 (10th Cir.1996) (officers waited 3 seconds at most and the government failed even to allege that the officers harbored a concern for their safety); *United States v. Lucht,* 18 F.3d 541, 550–51 (8th Cir.1994) (waiting 3 to 5 seconds before entering was not long enough), *cert. denied,* 513 U.S. 949, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994); *United States v. Rodriguez,* 663 F.Supp. 585, 587–88 (D.D.C.1987) (delay of 3 to 5 seconds was

---

**2.** The continuing validity of this distinction made by the Ninth Circuit is subject to some doubt in light of recent United States Supreme Court authority. In *United States v. Ramirez,* the United States Supreme Court rejected the Ninth Circuit's destruction/non-destruction distinction in the context of "no-knock" entries. In *Ramirez,* the Ninth Circuit held that the existence of a "mild exigency" justified a no-knock entry that could be accomplished without destruction of property. The Supreme Court reversed, holding that the same standard applied to "no-knock" entries regardless of whether property damage is required to effectuate the entry. The Court need not, based on the evidence before it, determine whether and to what extent *Mendonsa* was modified by *Ramirez.*

insufficient); *United States v. Marts,* 986 F.2d 1216, 1217–18 (8th Cir.1993) (lapse of less than 5 seconds held not sufficient to infer refusal of admittance necessary to comply with § 3109); *United States v. Nabors,* 901 F.2d 1351, 1355 (6th Cir.1990) (forced entry only seconds after announcing the officers' authority and purpose must be "carefully scrutinized"), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990). However, when officers have waited more than 5 seconds, the courts have generally held that there was no violation of the knock and announce rule. *United States v. Markling,* 7 F.3d 1309, 1318 (7th Cir.1993) (officers waited 7 seconds before starting to try to knock the door down), *cert. denied,* 514 U.S. 1010, 115 S.Ct. 1327, 131 L.Ed.2d 206 (1995); *United States v. Spriggs,* 996 F.2d 320, 322–23 (D.C.Cir.1993) (officers waited 15 seconds before attempting to enter), *cert. denied,* 510 U.S. 938, 114 S.Ct. 359, 126 L.Ed.2d 323 (1993); *United States v. Ramos,* 923 F.2d 1346, 1355–56 (9th Cir.1991) (after two requests and 45 seconds) overruled on other grounds, *United States v. Ruiz,* 257 F.3d 1030 (9th Cir.2001); *United States v. Myers,* 106 F.3d 936, 940 (10th Cir.1997) (agents waited 10 seconds before battering the door down), *cert. denied,* 520 U.S. 1270, 117 S.Ct. 2446, 138 L.Ed.2d 205 (1997); *United States v. Knapp,* 1 F.3d 1026, 1030–31 (10th Cir.1993) (10 to 12 seconds was sufficient to wait); *United States v. Gatewood,* 60 F.3d 248, 250 (6th Cir.1995) (no violation when officers waited about 10 seconds between announcement and entry), *cert. denied,* 516 U.S. 1001, 116 S.Ct. 546, 133 L.Ed.2d 448 (1995). In this case, the agents had no additional duty to again knock and announce on the interior door to Jenifer's bedroom. *See United States v. Crawford,* 657 F.2d 1041, 1045 (9th Cir.1981). Accordingly, the agents are entitled to qualified immunity with respect to the knock and announce rules, as to both the exterior and interior doors of the Huntington Beach property.

## VI. Service of Search Warrant and Protective Sweep

The requirement of Rule 41(d), Federal Rules of Criminal Procedure, that a copy of a search warrant be served on the occupant of property to be searched, is grounded in the Fourth Amendment. A violation of this rule, therefore, may result in the suppression of evidence in a criminal case. *United States v. Gantt,* 194 F.3d 987, 1005 (9th Cir.1999); therefore, because a failure to comply with Rule 41(d) could result in a constitutional violation, the Court examines the evidence in this case to determine whether defendants are entitled to qualified immunity.

Although it is now clearly established in the Ninth Circuit that searching officers must serve the search warrant, at the outset of the search, on persons present at a search of their premises, this rule was not clearly established at the time of the July 10, 1998, search of the Sunset Beach and Huntington Beach properties. *See Gantt,* 194 F.3d at 1005 (clearly establishing rule). Prior to *Gantt,* the law of the Ninth Circuit was that expressed in *United States v. Woodring,* 444 F.2d 749 (9th Cir.1971) and *Nordelli v. United States,* 24 F.2d 665 (9th Cir.1928).[3] In *Nordelli,* the Ninth Circuit

---

3. In *Gantt,* the Ninth Circuit summarily rejected the contrary rule enunciated in *Nordelli* as dicta. *See Gantt,* 194 F.3d at 1004. "[W]e had no opportunity in *Nordelli* to determine whether [Fed.R.Crim.P. 41(d)'s predecessor] required service before seizure." *Id.* However, a reasonable officer, in 1998, had no duty to foresee the Ninth Circuit's rejection of *Nordelli* as dicta in light of *Nordelli's* statement: "The fact that the agents entered upon the premises and made their seizures before delivering to the defendants a copy of the warrant and the supporting affidavits is not ground for supressing the evidence." *Nordelli,* 24 F.2d at 666.

affirmed denial of a motion to suppress evidence obtained before service of a search warrant was made. In *Woodring,* the Ninth Circuit reaffirmed *Nordelli,* and stated: "Rule 41(d) does require that federal officers ... serve upon the person searched a copy of the warrant and a receipt describing the material obtained, *but it does not invariably require that this be done before the search takes place."* *Woodring,* 444 F.2d at 751 (emphasis added).

■ Accordingly, the agents are entitled to qualified immunity for their actions in failing to immediately present Bybee with a copy of the search warrant. The Court believes that a prudent law enforcement officer would have carried a copy of the search warrant on his person upon entry into premises to be searched, and, absent concerns for the safety of the officers, that such a prudent law enforcement officer would have presented such copy immediately upon the request of an occupant. However, the standard for determining whether qualified immunity should be conferred does not involve a "prudent officer" standard; rather, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." On July 10, 1998, it was not plainly incompetent or a knowing violation of the law to refuse to present Bybee with a copy of the search warrant.

The failure to promptly present Bybee with a copy of the search warrant must be understood in the context of the officers' immediate concerns upon entry into the property—their own safety. In *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) the Supreme Court defined "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie,* 494 U.S. at 327, 110 S.Ct. 1093, 108 L.Ed.2d 276. The Court further explained that:

as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334, 110 S.Ct. 1093; *see also United States v. Noushfar,* 78 F.3d 1442, 1448 (9th Cir.1996) (quoting *Buie* and noting that "[a] protective sweep may last 'no longer than it takes to complete the arrest and depart the premises' "). In *Buie,* the Court defined the parameters of the protective sweep in a case that involved an arrest warrant. However, the policy underlying the central holding of *Buie*—the safety of the officers executing the warrant—is equally applicable to the execution of a search warrant. *See Drohan v. Vaughn,* 176 F.3d 17, 22 (1st Cir.1999) (noting that "[t]his circuit has held that when executing a search warrant, officers can perform a 'protective sweep' of an area if there is a reasonable suspicion of risk to the safety of the officers.").

Therefore, even under the holding in *Gantt,* an officer may be justified in failing to present a copy of the search warrant until after the officers on the scene have completed a protective sweep of the property. This proposition applied with even more force in 1998, before *Gantt* was decided. For these reasons, the agents are entitled to qualified immunity for their actions in failing to serve Bybee with a copy of the search warrant upon her request.

■ Conversely, it does not appear that the agents at the Huntington Beach

property ever served a copy of the search warrant on Jenifer Meredith, despite having a clearly defined obligation to do so under Fed.R.Crim.P. 41(d) and the Fourth Amendment. Accordingly, the agents are not entitled to qualified immunity for their actions in failing to serve Jenifer with a copy of the search warrant for the Huntington Beach property.

## VII. Excessive Force

It is well established that the use of excessive force in the execution of a search or arrest warrant will violate the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The test of reasonableness requires careful attention to the facts and circumstances of each particular case. *Id.* The reasonableness of a particular use of force must be judged from the perspective of an objectively reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Id.* at 396–97, 109 S.Ct. 1865. The question of whether an officer is entitled to qualified immunity as to an excessive force claim is analytically distinct from the inquiry as to the merits of the excessive force claim. *See Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001) (abrogating Ninth Circuit law to the contrary).

The question of whether excessive force was used is ordinarily a question of fact for the jury. *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995). "However, ... defendant officers 'can still win on summary judgment if the district court concludes, after resolving all

factual disputes in favor of the plaintiff, that the officers' use of force was objectively reasonable under the circumstances.'" *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir.1997) (citations omitted).

The Ninth Circuit has characterized the *Graham* balancing test as one that examines the force that was applied, balanced against the need for that force. *Liston*, 120 F.3d at 976. In *Liston*, the subject of the search warrant no longer resided at the residence that was the subject of the search warrant. Upon arrival, a number of officers threw the homeowner to the ground, handcuffed him, and pointed several guns at him. The Ninth Circuit held that the homeowner had raised a triable issue of fact as to whether excessive force was used in the execution of the warrant. *Id.* at 970–72; *see also Franklin v. Foxworth*, 31 F.3d 873 (9th Cir.1994) (holding that trial court, pursuant to bench trial, erroneously concluded that manner of execution of search warrant was reasonable where disabled occupant of residence to be searched was removed from his sickbed in semi-naked state and was forced to remain so in full view of twenty-three armed strangers).

The Court concludes that defendants are not entitled to qualified immunity on the issue of whether they used excessive force in the execution of search warrants at plaintiffs' Sunset Beach property. Plaintiffs have offered evidence that the officers entered the premises, in clothing which did not readily identify them as law enforcement, with guns drawn and pointed at the occupants. At least one officer carried a battering ram or an ax. Although a protective sweep of the premises uncovered no weapons, the occupants of the property were detained for many hours; plaintiff Bybee was physically restrained, taken to the ground, and hand-

cuffed for some thirty minutes. Her arms were bruised as a result of the struggle with Officer Erath, and her wrists were in pain because of the tightness of the hand-cuffs.[4] The occupants were not allowed to use the telephone and could not use a restroom unless accompanied by an officer.

Under the circumstances, the alleged facts might not support a denial of qualified immunity. "[A] warrant to search *for contraband* founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981) (emphasis added). Here, the Court is dealing with a warrant to search for evidence. As the *Summers* court recognized, "[S]pecial circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case." *Id.* at n. 21, 101 S.Ct. at 2595.

"[W]hile detentions of occupants during the period of a search will under most circumstances prove to have been reasonable, a detention may be unreasonable in a particular instance either because the detention itself is improper or because it is carried out in an unreasonable manner." *Franklin*, 31 F.3d at 876. Here, plaintiffs allege that although only one person was listed as the target of the search, all occupants of both properties were confronted at gunpoint and detained for many hours while the agents searched for records and documents in connection with a tax inquiry. As the *Franklin* court observed:

"There is a basic difference between the two categories of cases. Persons being arrested are ordinarily suspected of having committed serious, often violent, offenses. Persons being detained while a search of the house is being conducted may simply be visiting a home or business for an innocuous if not benevolent purpose. A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy." *Franklin*, 31 F.3d at 876.

Plaintiffs have similarly raised a triable issue of fact as to whether the manner of executing the search warrant at the Huntington Beach property was reasonable. Viewing the evidence in a light most favorable to the plaintiffs, the agents forced one young female occupant, at gunpoint, out of the residence in her underwear, and required another young female occupant to get dressed in full view of four male agents whose guns were pointed at her—agents who did not identify themselves as agents of the federal government. While these actions occurred in the context of protective sweep, the Court finds it relevant that the search warrant was not for contraband but for evidence. Accordingly, the agents are not entitled to qualified immunity for their actions in executing the search warrant at the Sunset Beach or Huntington Beach properties.

## VIII. Unconstitutional Detention of Occupants

■■■ Whether an individual is in custody is determined by an objective stan-

---

4. It is interesting to note that much of Bybee's distress was the result of her repeated demand for a search warrant. None was shown to her. As the *Gantt* court observed, people "may be more likely to conclude agents are overstepping their authority if they are not provided a warrant, particularly after asking to see one. Courts have typically assumed that the absence of a warrant creates 'greater potential for confrontation and violence,' *United States v. Hepperle*, 810 F.2d 836, 839 (8th Cir.1987). One of the purposes of requiring agents to 'hand ... the occupant ... the warrant, like that of the knock and announce rule, is to head off breaches of the peace by dispelling any suspicion that the search is illegitimate.'" *Gantt*, 194 F.3d at 1002 (citation omitted).

dard—whether the individual reasonably believed he or she was free to go. *United States v. Melvin*, 91 F.3d 1218, 1222 (9th Cir.1996).

■ As noted in Section VII, upon execution of a search warrant authorized to search for contraband, law enforcement officers are justified in detaining the occupants of the place to be searched for the duration of the search. *Summers*, 452 U.S. at 704–05, 101 S.Ct. 2587 (1981). This rule does not necessarily apply to a search warrant authorized to search for evidence. *See id.*, 452 U.S. at 704 n. 20, 101 S.Ct. 2587.

■ *Summers* has been interpreted to require inquiry into the intrusiveness of the detention as weighed against the law enforcement interests in detaining occupants. *See United States v. Rowe*, 694 F.Supp. 1420, 1423–24 (N.D.Cal.1988). In the first part of the inquiry, courts should analyze the extent to which detention will add to the intrusiveness of the search itself, whether law enforcement officers are likely to exploit or unduly prolong the detention to gain information, and the extent to which the detention adds to the public stigma associated with the search. *Id.* The second part involves inquiry into the law enforcement interest in preventing flight in the event that incriminating evidence is found, minimizing the risk of harm to the officials, facilitating orderly completion of the search (because the detained occupant may have keys to open locked doors or containers). *Id.* at 1424.

■ As noted, the agents detained all occupants of both properties. There is no evidence the agents were attempting to prevent the flight of the occupants by detaining them; of the occupants, only Meredith was identified as being suspected of any crime. There is no evidence that any of these individuals presented any risk of harm to the agents. On the whole, the evidence viewed in a light most favorable to the plaintiffs leads the Court to conclude that the agents are not entitled to qualified immunity with respect to their actions in detaining the plaintiffs.

With respect to the Huntington Beach property, plaintiffs have offered evidence that Jenifer was kept out of her residence, in full view of her neighbors, for about an hour. When expressing her desire to go to her mother's house, the agents said, "You don't want to go there right now" and started chuckling about it. The agents, of course, were well aware that a simultaneous search warrant was being served on the Sunset Beach property, but there is no evidence ·that Jenifer was aware of this. Jenifer could have reasonably interpreted this statement as one that meant she was not free to go. Nor does it appear, as a practical matter, that Jenifer had anywhere to go without retrieving certain belongings from her residence. Jenifer and the other occupants of the Huntington Beach property were interviewed, thereby allowing an inference that the agents had a motivation to unduly detain the occupants to gain information that they otherwise would not have been able to acquire. Jenifer's detention added significantly to the public stigma associated with the search because she and her friends were detained in full view of her neighbors. Jenifer testified that she perceived a change in her neighbors' attitude toward her as a result of the search. The law enforcement interests in detaining her do not seem particularly strong. There is no evidence the agents were concerned with the possibility of flight. Nor is there evidence that Jenifer posed any risk of harm to the agents. If Jenifer's presence could have facilitated the orderly completion of the search, there is no evidence of that in the record presented to the Court. Accordingly, the agents are not entitled to qualified immunity for their three-hour detention of Jenifer.

## IX. Individual Agents

### A. Agent Sparkman

██ Defendants correctly argue that the uncontroverted evidence establishes that Agent Sparkman did nothing other than assist her fellow officer in handcuffing Bybee. Given her limited perspective, Agent Sparkman was entitled, upon her entry onto the third floor and upon seeing Agent Erath attempting to handcuff Bybee, to assist him without further question into the appropriateness of her colleague's actions. Additionally, although plaintiffs argue that the handcuffs were too tight, even Bybee herself acknowledges that the handcuffs were loosened upon her complaint that they were too tight. Accordingly, defendants are entitled to summary judgment as to all claims asserted against Agent Sparkman.

### B. Agent Mazon

██ Defendants argue that no evidence has been presented that would raise a triable issue of fact with respect to any claim asserted against Agent Mazon. No plaintiff could identify Agent Mazon or her activities on July 10, 1998. Contrary to plaintiffs' arguments, there is no "team effort" liability under § 1983 and each agent may be held liable only for the constitutional violations he or she commits. *See Chuman v. Wright,* 76 F.3d 292 (9th Cir.1996). In *Chuman,* the Ninth Circuit held that it was reversible error for a district court to instruct the jury that an individual police officer could be found liable under § 1983 for his "team effort" in executing a search warrant even if the individual officer was himself guilty of no constitutional violation. The Ninth Circuit concluded that such an approach provided improper alternative grounds for § 1983 liability, and that it impermissibly allowed the jury to "lump all the defendants together, rather than require it to base each individual's liability on its own conduct."

Therefore, there is no evidence from which a reasonable jury could conclude that Agent Mazon violated the constitutional rights of plaintiffs. Accordingly, defendants are entitled to summary judgment as to all reasonable jury could conclude that Agent Mazon violated the constitutional rights of plaintiffs. Accordingly, defendants are entitled to summary judgment as to all claims asserted against Agent Mazon.

## X. Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment is hereby **GRANTED IN PART AND DENIED IN PART**. The defendants are entitled to qualified immunity as to, and therefore summary judgment in their favor is granted as to, the following claims: 1) plaintiffs' claims as to defendants' alleged violations of the "knock and announce rule"; and 2) plaintiffs' claims regarding the delayed presentation of the search warrant at the Sunset Beach property.

Defendant Sparkman is entitled to qualified immunity as to all claims asserted against her. Accordingly, summary judgment in favor of Agent Sparkman is granted as to all claims.

For the reasons stated in the previous section, summary judgment in favor of Agent Mazon is also granted as to all claims.

The defendants are not entitled to qualified immunity as to, and therefore summary judgment is denied as to, the following claims: 1) plaintiffs' claims regarding the failure to present the search warrant at the Huntington Beach property; 2) plaintiffs' claims regarding the alleged use of excessive force in executing the search warrants at both properties; and 3) plaintiffs' claims regarding the unconstitutional

detention of the occupants at both proper-
ties.